479 So.2d 1331 (1985)
James Edward DUNNAWAY
v.
STATE.
7 Div. 387.
Court of Criminal Appeals of Alabama.
July 2, 1985.
As Corrected on Denial of Rehearing October 22, 1985.
*1332 Luther S. Gartrell III, Ashville, for appellant.
Charles A. Graddick, Atty. Gen., and Gerrilyn V. Grant, Asst. Atty. Gen., for appellee.
LEIGH M. CLARK, Retired Circuit Judge.
A jury found appellant guilty on a trial on an indictment that alleged in pertinent part the following:
"James Edward Dunnaway, ... whose true name is otherwise unknown to the Grand Jury, did intentionally damage a building of J.W. Eurton by starting or maintaining a fire or causing an explosion, in violation of Section 13A-7-42 of the Code of Alabama."
After due notice that the State would proceed against defendant under the Habitual Felony Offenders Act, a sentencing hearing was conducted, at which it was shown that defendant had been previously convicted of three felonies, and the court sentenced him to life imprisonment, which is mandated by § 13A-5-9(c)(2).
The owner of the house, Mr. J. W. Eurton, testified as a witness called by the State. He had never lived in the house, which was located in Ragland, but had rented it to others. He testified that about 11:00 P.M. on March 17, 1983, he learned that the house was on fire and called the Ragland Fire Chief to find out more about it and was informed by the Chief that the fire had been extinguished and he did not go to the house until the next morning. He found that the house was "totaled" and that it "had to be completely torn down," but that there was "maybe one room still standing" and the "roof was probably still there, but it had been cut through in several places." According to Mr. Eurton's further testimony, the house had been vacant for about four or five days, it having been vacated by a tenant with whom Mr. Eurton had had no dispute. Mr. Eurton had bought the house from a lady who had a mobile home next door on one side of the house, whose daughter, who was the exwife of defendant (appellant), had occupied the mobile home at times. Mr. Eurton further testified that there had been a title dispute between him and the owner of the mobile home as to some of the land between the house owned by Mr. Eurton and the land upon which the mobile home was located.
According to the undisputed evidence in the case, the Ragland Fire Department was notified of the fire at about 8:00 P.M. on March 17, 1983, and personnel thereof promptly responded to the call and efficiently extinguished the fire as soon as possible.
Mr. Gilbert Ray Norman, a deputy State fire marshall, whose district included St. Clair County, testified that he was notified of the fire the day after it occurred, that after advising the Sheriff's office to secure the premises against invasion, he went to the scene, found "some crime scene ribbon up," remaining parts of the house that had been burned, and took "some samples there" of the wood, which constituted the frame building that had been burned, and put the samples in two cans, which he delivered to the Department of Forensic Science at a State laboratory at Jacksonville, where he locked them in an evidence drawer.
Mr. John M. Case, who was employed as a criminalist with the Alabama Department of Forensic Science, in Jacksonville, with "sixteen years of on-the-job training" and who had testified previously in cases in Alabama as a criminalist, testified as to his analysis of the material that had been *1333 brought to the crime laboratory by Deputy Norman. He testified on call of the State. Parts of his testimony are as follows:
"A. Each can contained mineral spirits, which is also found in some commercial products.
"Q. Is that, in fact, a petroleum distillate that you characterize in that nature?
"A. Yes, sir."
Ms. Joy Dodd testified on call of the State. She testified that she was the daughter of the lady who owned the mobile home above mentioned that was close to the mentioned building of Mr. Eurton and who had sold the building to Mr. Eurton. She also testified that she had been the wife of the defendant. We quote from her testimony as follows:
"Q. Do you know, with your own knowledge, whether she and Mr. Eurton had a disagreement concerning this sale?
"A. Yes, sir.
"Q. Do you know, of your own knowledge, what this suit was about?
"A. In general terms, I do.
"Q. What was that?
"A. Something about the boundary line and the carport connected with the trailer.
"Q. Do you recall hearing your mother make any comment about the house at your trailer any time prior to March 1983?
"A. Yes, sir.
"Q. When was that?
"A. I'm not sure the exact time. It was after Bubba [the defendant] had come to live with us.
"...
"A. She came in and said she wanted the house burned. She was very upset and angry. She walked to the door and asked where Bubba was. She said, `I want to talk to him.'
"...
"Q. I think we were talking about the next conversation that you had with Mr. Dunnaway [the defendant] concerning what your mother had said. When in your best judgment, did that conversation take place?
"A. It would be in the latter part of February or early part of March.
"...
"A. He said she wanted the house burned. She had agreed to give him $600part of it that day and part to be paid after the house was burned.
"Q. Was anything else said at that time and place?
"A. He told me the amount he received. I don't remember what it was ... and the amount she was to pay later.
"Q. What do you mean `pay later'?
"A. After the house was burned.
"Q. Do you recall any other conversations you had with the defendant, Mr. Dunnaway, about the burning of this house?
"A. Yes, sir, I asked him not to do it.
"...
"Q. Let me ask you about the first time you asked him not to do it. When did that conversation take place?
"A. That same day he came in with the money, and I asked him not to do it.
"Q. What was his response at that time and place?
"A. It was a simple thing to do ... that an arson was not that easy to trace. He could get by with it easily and there would be no danger of getting caught.
"...
"Q. When was this last conversation had with Bubba after talking with the FBI in relation to the day the house burned?
"A. I talked to him the day he burned it trying to keep him from it."
The only witnesses who testified on call of the defendant were Ronald Lee Dunnaway and Harvey Alton Fuller, whose testimony purports to be summarized in the brief of counsel as follows:
"Defense called Ronald Lee Dunnaway, who under oath testified the Appellant was his father and he had moved a green Vega automobile from the Eurton house a few weeks before the fire (R. 154). He *1334 testified that he didn't recollect if Campbell had helped him move the car (R. 154-R. 159).
"Defense then called Harvey Alton Fuller, who testified he drove a fire truck to the fire and helped extinguish it. He testified about the damage and details concerning the fire (R-160-R163)."

I.
The first issue is thus captioned in brief of counsel for appellant:
"DID DISTRICT ATTORNEY HAVE RIGHT TO IMPEACH HIS OWN WITNESS THROUGH SURPRISE FOR THE AVOWED PURPOSE OF IMPEACHMENT?"
This issue is directed at a part of the testimony of Joe Gay Campbell, Jr., on direct examination by the State, who had testified that he was a friend of defendant and recalled the fire at the house owned by Mr. Eurton and that the defendant had told the witness that defendant's mother-in-law wanted the house burned over a land dispute. After being questioned further on direct examination, his testimony continued as follows:
"Q. Did you have any further conversation with him that day concerning the possible fire?
"A. Not that I remember.
"Q. How about after that dayafter you moved that cardid you talk to Bubba and Bubba told you about a fire at that yellow house?
"A. I couldn't say for sure.
"Q. You have already testified that you remember when the house burned. Did you ever talk with Bubba after it burned?
"A. Not that I recall."
After the appellant's attorney had concluded his cross-examination of defendant, the following occurred:
"MR. ABBOTT [Attorney for the State]: Your Honor, we need to make an offer of proof outside the presence of the jury. We intend to claim surprise in regard to some of the testimony offered by this witness. We would like to make a showing to the Court.
"(At this time, the jury was removed outside the presence and hearing of the Court [sic, but we believe that what was meant was the `jury' and not the `Court'] and the following procedures were had and done:)
"MR. ABBOTT: Your Honor, the State would offer to show there has been a previous statement signed by Joe Gay Campbell, Jr., the one referred to by Mr. Davis in his cross-examination, dated March 29, 1983, wherein this witness said the defendant told him that the defendant's mother-in-law, Gertrude Moses Poer, had offered the defendant $2,000 to burn the house in question. The State would show unto the Court that on several occasionsas late as this morning, I personally questioned the witness about the statements that were made, and whether an indication was made as to what Mr. Dunnaway said if he was going to turn it and if any money was offered. We discussed it, and he said it may not have been $2,000, it may have been some lesser sum. We claim surprise at this time, and request permission of the Court to ask leading questions of this witness.
"THE COURT: Gentlemen, I don't know if there could be more leading questions than what has been asked all afternoon.
"MR. ABBOTT: We propose to ask two questions: `Did Bubba Dunnaway tell you that he was going to burn the house?' The second question, `Did Bubba Dunnaway say that his mother-in-law offered him some money to burn the house?' That's all we want to ask."
The colloquy among the trial judge and the attorneys for the respective parties continued for two or three more pages of the transcript, with the trial court indicating that it would sustain the objection of defendant's attorney to the contemplated interrogation of the witness by State's attorney as to his previous statement in the writing signed by the witness. The transcript then shows:

*1335 "(At this time, Court was recessed until the following morning with the Jury being properly instructed by the Court.)"
The transcript then shows the following as the first thing done in the case on the following morning:
"September 19, 1984

"THE COURT: At the close of the preceding date, September 18, 1984, the state was examining the witness, Joe Gay Campbell and questions were asked relating to prior inconsistencies of statements. The Court sustained the objection by the defendant's attorney. The Court, after further consideration, reverses the ruling and overrules the objection.
"MR. DAVIS: Judge, I would renew my objection to allow the State to put Mr. Campbell back on the stand in an effort to rehabilitate him and correct the prior inconsistencies of statements. In doing so, they are impeaching their own witness. They have claimed surprise. I say there is no basis for a claim of surprise. There were no inconsistent statements. The statement was not offered in evidence. I respectfully renew my objections.
"THE COURT: Overruled.
"Bring the Jury in.
"(At this time, the Jury was seated in the jury box, and the following proceedings were had and done:)
"MR. WILLIAMSON: We recall Mr. Joe Gay Campbell, Jr.
"JOE GAY CAMPBELL, JR.
"Having been previously sworn, took the stand and testified as follows:
"ON EXAMINATION BY MR. WILLIAMSON
"Q. For the record, state your name.
"A. Joe Gay Campbell, Jr.
"Q. You are the same Joe Gay Campbell, Jr., that testified in this matter yesterday?
"A. Yes.
"Q. On March 29, 1983, did you talk to the sheriff's deputies and the State Fire Marshall here at the Sheriff's Office at Ashville?
"A. What date?
"Q. March 29, 1983, some time around 4:30 P.M.
"A. Yeah.
"Q. You did?
"A. Yes.
"Q. At that time, did you make a statement that Bubba Dunnaway told you that Gertrude Poer was to give him a certain sum of money to burn that yellow house down?
"MR. DAVIS: Judge, I object to leading.
"THE COURT: Overruled.
"A. Repeat that.
"Q. At that time, did you make a statement that Bubba Dunnaway had told you that Gertrude Poer was to give him a certain sum of money to burn that yellow house?
"A. Yes.
"Q. Have you made the statement that Bubba Dunnaway said he was going to burn the house?
"A. Yes.
"Q. Since you testified in this matter yesterday afternoon, have you talked with either me or Mr. Abbott or any of the district attorneys concerning this?
"A. No.
"Q. That's all.
"ON EXAMINATION BY MR. DAVIS:
"Q. What made you change your mind about your testimony that you gave up here under oath yesterday?
"A. I got to thinking about it.
"Q. What exactly did you tell them in the statement that you gave on March 29th, that you didn't tell us yesterday that you didn't tell these twelve people while you were under oath?
"A. I don't know.
"Q. Were you under oath when you signed that statement for the Sheriff's Department?
"A. No.
"Q. Were you made any promises or offers of reward for doing that?
"A. No.

*1336 "Q. Why did you give a statement on March 29th?
"A. I don't know.
"Q. Did you write a statement out in your writing?
"A. No.
"A. Did you sign a statement?
"A. Yes.
"Q. You are sure you did?
"A. Yeah.
"Q. Did you give any oral statements before you gave the written statement?
"A. Yeah.
"Q. You don't know why you gave any of them?
"A. They asked.
"...
"Q. Is it your testimony that you heard my client, Bubba Dunnaway, make a statement in your presence about some money that was going to be paid for this job?
"A. There was something about money.
"Q. How much money was it? You remember everything else about what my man said that day. Tell me how much money he said he was going to get paid.
"A. About $2,000.
"Q. What else do you remember that you told them on March 29th?
"A. Nothing right off hand."
It appears that there is now no disagreement between the parties on appeal as to the principle that, although generally a party may not impeach his own witness by showing a previous statement by him in conflict with what he testified, an exception to such rule is to be found when the party who calls the witness is genuinely surprised by his testimony, as to which the contradictory statement of the witness is sought to be shown. This correct principle has been recently applied in Dennard v. State, Ala.Cr.App., 405 So.2d 408, 410-411, in which Judge Tyson states, with a citation of a number of supporting authorities, the following:
"Although one may not generally impeach his own witness, an exception exists where a party may, when put to a disadvantage by unexpected answers for the purpose of showing surprise or questioning the witness' recollection, ask him if he had not made prior statements inconsistent or contrary to his instant testimony. Under the theory of surprise, the State may elicit from the witness the fact that he had made prior inconsistent statements and the contents thereof."
In our opinion, contrary to the insistence of appellant, State's attorney was surprised and had good reason to be surprised by the testimony of its own witness and was entitled to show his previously signed written statement in conflict with the testimony. This determination results in a determination adverse to appellant as to the first issue.

II.
The following are the first three sentences in the first paragraph of the argument in brief of counsel for appellant in support of Issue II:
"By Joy Dodd's own admission, she was an accomplice. It became a question of law for the Court. It was not a disputed fact for the jury."
The following is the last paragraph in brief of counsel for appellant as to this issue:
"There is no conflict in the testimony that Joy Dodd was not an accomplice. McCrary v. State has held `when there is no conflict in the testimony, the question of whether a witness is an accomplice is a question of law for determination by the trial court. Dodd never denied `any participation in the offense'...."
It was held in McCrary v. State, Ala.Cr. App., 398 So.2d 752, 755, cert. denied, Ala., 398 So.2d 757:
"Where there is no conflict in the testimony, the question of whether a witness is an accomplice is a question of law for determination by the trial court. The trial court properly held Taylor was not an accomplice as a matter of law. Pryor v. State, 47 Ala.App. 706, 260 So.2d 614; Leonard v. State, 43 Ala.App. 454, 192 *1337 So.2d 461; Kyles v. State, Ala.Cr.App., 358 So.2d 797."
Without determining whether there was any conflict in the evidence in the case sub judice as to whether the named witness was an accomplice, we hold that appellant fails to show any error prejudicial to defendant, inasmuch as the trial court was not requested by defendant to make a determination that the named witness was an accomplice. Apparently, neither party requested the trial court to make a determination as a matter of law as to that question. This distinguishes the case sub judice from that of McCrary v. State. We determine appellant's Issue II adversely to appellant.

III.
By this issue, appellant endeavors to show that the evidence was insufficient, when considered after the elimination of testimony of an accomplice, to entitle the State to a submission to the jury of the issue as to defendant's guilt. We disagree. The circumstantial evidence, the expert testimony as to the origin and cause of the fire by the use of mineral spirits, or the like, and the incriminating statement signed by defendant, combine to present substantial evidence of his guilt.

IV.
In the brief of counsel for appellant, a little different approach is made as to the contention made by appellant in Issue III as to the insufficiency of the evidence, independently of testimony by an accomplice, to support the submission to the jury of the question of defendant's guilt. For the same reason stated in our discussion as to Issue III we determine Issue IV also adversely to appellant.

V.
By the final issue contained in brief of counsel for appellant, the contention is made that "There is no evidence that the crime scene was secured, that the house did not have a subsequent fire, that there was no tampering with the house during the seven days before the fire marshall collected his samples." Although appellant may be correct in contending that the scene may not have been made as secure as it should have been made, the weight of the evidence of such circumstance was well within the province of the jury to decide. It cannot be stated that such circumstance has the effect of making it "clear that the State has failed to prove corpus delicti."
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.

ON APPLICATION FOR REHEARING
LEIGH M. CLARK, Retired Circuit Judge.
In brief of counsel for appellant in support of his application for rehearing, he requests "Relief under Rule 39(k) of the Alabama Rules of Appellate Procedure" as to the second sentence of the following paragraph contained in the opinion on original submission:
"By this issue, appellant endeavors to show that the evidence was insufficient, when considered after the elimination of testimony of an accomplice, to entitle the State to a submission to the jury of the issue as to defendant's guilt. We disagree. The circumstantial evidence, the expert testimony as to the origin and cause of the fire by the use of mineral spirits, or the like, and the incriminating statement signed by defendant, combine to present substantial evidence of his guilt."
As urged by appellant's attorney, the second sentence of the paragraph quoted in the opinion on original submission was an *1338 incorrect statement of the writer, which is hereby corrected so as to read as follows:
"The circumstantial evidence, the expert testimony as to the origin and cause of the fire by the use of mineral spirits, or the like, and the incriminating oral statement by defendant, combine to present substantial evidence of his guilt."
The conclusion reached on original submission that the judgment of the trial court should be affirmed should not be changed, and the application for rehearing should be denied.
OPINION CORRECTED; APPLICATION FOR REHEARING OVERRULED.
All the Judges concur.