OPINION OF THE COURT
Fuchsberg, J.
Defendant Warren Knapp was convicted, following a jury trial, of criminal possession and of criminal sale of a controlled substance, each in the sixth degree (Penal Law, §§ 220.06, 220.31). The Appellate Division having affirmed, the appeal is here by permission of a Judge of this court (CPL 460.20).
In the main, we are called upon to decide whether the *692 warrantless search of defendant’s home, conducted at the time of his arrest, was reasonable within the meaning of our Constitutions (NY Const, art I, § 12; US Const, 4th, 14th Arndts). For the reasons which follow, we conclude that, in important part, it was not.
The recital of the facts, taken in a light most favorable to the People, may well begin with the role played by a 21-year-old biochemistry student, Frederick Allen Botway, who, in expectation that he would receive favorable consideration on an unrelated pending drug charge for which he was then under indictment, agreed to act as a police informer. In pursuit of that undertaking, and with the encouragement of Detective Robert Sievers, a Suffolk County undercover agent, Botway accepted an opportunity offered by an acquaintance, the defendant Warren Knapp, to guide and assist the latter, who was relatively ignorant of chemistry, in a project to produce a quantity of the controlled drug methaqualone.
The work had already begun, and with Botway’s help, continued in the basement of the defendant’s house. When it had progressed to a point where the manufacture was almost complete, Knapp told Botway that he expected to effect a sale of the drugs to a third party. On learning of this development, Sievers instructed Botway to tell Knapp that he had a friend who was interested in buying it. After an interval during which the informer reported on some supposed discussions with his prospect, a “friend Bob”, Knapp expressed a willingness to make such a sale at a contemplated price in the range of seven to eight hundred dollars, to be shared between Knapp and Botway. A time was then fixed for Botway to bring “Bob” to the house where he could meet Knapp and make his planned purchase.
When early on the appointed day, Botway, “friend Bob” in the person of Sievers in tow, arrived at the house, they came to the back door where Knapp, still in a bathrobe, admitted them directly to the kitchen. Unbeknownst to Knapp, a back-up team of four other police officers was waiting nearby to assist Sievers and Botway. After the introduction, the defendant left for his personal bedroom, from whence he returned with two plates, each of which *693 contained a portion of the drugs. He set these down on the kitchen counter. Asked by Sievers whether that was the total, he replied that there was an additional plateful, along with a supply of capsules in which the drugs could be packaged for convenient ingestion, still in his bedroom. Sievers and Knapp then confirmed a price of $750.
At this point, the agreement to sell having been completed, as prearranged between Sievers and his informer, the latter was dispatched, ostensibly to get the money from a car, but in fact to signal the waiting police reinforcements, who, also gaining access through the rear door, entered the kitchen, where Knapp was about to be arrested. The informer having previously alerted his cohorts to the fact that the defendant rented bedrooms to four individuals who at that hour might still be in the house, the police at once rounded up and secured all four. By then, Sievers and company had also taken possession of the drugs the defendant had brought into the kitchen.
It was only after they had assured themselves of complete control of the house and its occupants that the police took their next step, a warrantless entry into defendant’s bedroom. There they found and seized the capsules and the third plate of methaqualone of which Knapp had spoken to Sievers.
The final relevant police activity in the house was to search the basement. The testimony indicates that this they did not do until 45 minutes to an hour after the arrest. As a result of Sievers’ superintendence of the informer’s earlier activity, the police, of course, had known well in advance that this was the location of the defendant’s homemade laboratory. There, besides some electronic appliances, they seized Bunsen burners, test tubes, chemicals, “raw” methaqualone and assorted pills.
Following a pretrial hearing, an omnibus motion to suppress the objects seized in the defendant’s home was denied. County Court, without differentiating among its various phases, sweepingly held that the search and seizure. “was a reasonable and proper activity” “made during the course of and immediately following such arrest”.
*694 In so doing, the court failed to recognize that, analytically, there were three different seizures. Reviewing these in chronological order, the avails of the first were the two plates seized in the kitchen at the time of Knapp’s arrest. The fruits of the second, which flowed from the search of Knapp’s personal bedroom, were the third plate and capsules. It was in the last one, of the basement, that the People gained possession of the “laboratory” articles.
In the evaluation of each of these episodes of the broader event, we start with the reminder that our Constitutions accord special protection to a person’s expectation of privacy in his own home (NY Const, art I, § 12; US Const, 4th, 14th Amdts; Steagald v United States, 451 US —, 49 USLW 4418, 4421; Payton v New York, 445 US 573, 585, 589-590; People v Calhoun, 49 NY2d 398, 402). To further insulate this right, subject only to carefully drawn and narrow exceptions, a warrantless search of an individual’s home is per se unreasonable and hence unconstitutional (Mincey v Arizona, 437 US 385; 393-394; People v Gonzalez, 39 NY2d 122, 127; People v Williams, 37 NY2d 206). Further, to militate against any rationalizing away of these protections, the burden of proving the existence of sufficiently exceptional circumstances is placed squarely on the shoulders of the government (Vale v Louisiana, 399 US 30, 34; accord People v Hodge, 44 NY2d 553, 557). All the more is this so when there is ample opportunity to obtain a warrant (compare People v Hicks, 38 NY2d 90, with People v Spinelli, 35NY2d 77, 81-82).
We now turn to each phase of the search to determine whether the burden of proving that the fundamental and interrelated principles to which we have referred were respected in each instance.
The seizure of the two plates in the kitchen is easiest to justify because it was a search incident to arrest. Obviously, an arrest may provide a ready motive for a desperate suspect to attempt to offer resistance, with or without available weapons, or to destroy any incriminatory evidence that is within his reach. To guard against such eventuality, not the least of which is danger to the arresting officers themselves, the law, with sense and practicality, permits a *695 limited “search of the arrestee’s person and the ‘area’ within his immediate control” to take place then and there (Chimel v California, 395 US 752, 763; see, also, People v Belton, 50 NY2d 447, cert granted 453 US —, 49 USLW 3515; People v Perel, 34 NY2d 462).
By this criterion, we cannot say that the kitchen search was unreasonable as a matter of law. Targeted to the two plates alone, it involved no rummaging. Nor was it an independent investigative inquiry. In real perspective, the cautionary search for and assembling of the renters, the consummation of the arrest and the protective seizure of the two plates of contraband were going forward contemporaneously, the latter two in close proximity in the same room.
In this temporal and spatial immediacy, it could have needed no more than the movements of an unsuccessful struggle to reach and scatter the plates, whose uncapsulated contents were later to be described as mucous-like in consistency. Moreover, it was too early to reliably appraise defendant’s penchant for resistance or destruction, if any, or his ability, at all odds, to essay either. Under these circumstances, the affirmed findings upholding the reasonableness of this judgment in the “field” may not be disturbed (see People v Alexander, 37 NY2d 202, 204).
In contrast, the subsequent searches of the bedrooms and the basement give us more than pause. To justify these, the People place primary reliance upon the exception carved out for “exigent circumstances” and, alternatively, upon the one for “plain view”. And, as an ultimate resort, after candidly recognizing that the 45 minute to an hour hiatus between the arrest and the search of the basement made that one in particular difficult, if not impossible, to defend, the People also urge us to sustain that seizure, as well as the one in the bedroom, either on a theory of inevitable discovery or on its pragmatically related cousin, harmless error.
The “exigent circumstances” doctrine, which allows for broader application of much of the logic which permeates the search-incident-to-arrest exception, is said to exist *696 whenever, though there is probable cause to search, urgent events make it impossible to obtain a warrant in sufficient time to preserve “ ‘evidence or contraband threatened with removal or destruction’ ” (People v Vaccaro, 39 NY2d 468, 472, quoting Chapman v United States, 365 US 610, 615). But, even when that holds true, the scope of conduct thus sanctioned is strictly limited by the necessities of the circumstances in which it arises (People v Gonzalez, 39 NY2d 122, 127, supra; People v Clements, 37 NY2d 675, 679, cert den sub nom. Metzger v New York, 425 US 911).
These cautions in mind, before the police here undertook their search of either the bedroom or the basement, it is clear that any urgency was gone. Since the arrival of Sievers and Botway on the morning of the arrest was pursuant to appointment, made on a previous day, there had long been more than ample time in which to have applied for a warrant so that a Judge could objectively pass on the justification for the contemplated intrusion. Nothing about the entry onto the premises was left to spontaneity or opportunism. Not even a shift in the target time was to be anticipated. The climax of the investigation was well planned. Knapp had not been apprehensive. There was every reason to believe circumstances would not change.
Furthermore, if anything, there was even less uncertainty after the arrest. Indeed, the suppression court made no finding of any kind of emergency (cf. People v Clements, 37 NY2d 675, 677, supra), confining itself instead to a declaration that the contraband was of a type that “could easily be disposed of”. However, in and of itself, this is not a predicate for an exigency (Vale v Louisiana, 399 US 30, 34-25, supra; People v Torres, 45 AD2d 185, 187). The constitutional protections do not hinge upon whether drugs or other contraband are capable of easy removal or destruction. Absent any showing that they were self-destructable within the time frame with which the police in the present case had to reckon, the fact that they were beyond the reach of any destructive agency, human or mechanical, ruled out any inherent exigency.
As already indicated, by the time the police took it upon themselves to invade the bedroom, they were in complete *697 control of the house. All occupants were out of commission. The information obtained from Botway had turned out to be reliable. There had been no hidden surprises. According to their own testimony, the only reason the police entered the room was to search for the drugs and capsules Knapp had described.
There was therefore no excuse for proceeding without a warrant, unless it was the personal impatience or inconvenience of the police, considerations which never may be permitted to outweigh the constitutional interests at stake (Steagald v United States, 451 US —, 49 USLW 4418, 4423, supra). The time and effort it may have taken to comply with the warrant prescription, and any delay it may have occasioned in seizing the additional drugs and paraphernalia, subjects on which the People proffered no proof, presented no demonstrated danger to the public or the police.
Similarly unavailing was “plain view”. This exception is premised on the rationale that what a person exposes to the public eye cannot be the subject of a legitimate expectation of privacy (People v Spinelli, 35 NY2d 77, 80, supra). But, it “may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges” (Coolidge v New Hampshire, 403 US 443, 466). Since the warrantless entry into the bedroom and basement here had no such prior justification, the objects observed and nevertheless seized must be suppressed as the product of that illegality (People v Allende, 39 NY2d 474, 477). In addition, we note that there was no finding nor, for that matter, testimony at the suppression level that the items seized in the bedroom, even then, were in plain view.
“Inevitable discovery” is of no greater help to the People. That doctrine, logically somewhat akin, for instance, to the “independent source” on which the acceptance of many disputed criminal identifications depends (Gilbert v California, 388 US 263, 272; People v Ballott, 20 NY2d 600, 606), stands for the proposition that fruits of an unlawful search need not be suppressed where there is “a very high degree of probability that the evidence in question would have been obtained independently of the tainted source” *698 (People v Payton, 45 NY2d 300, 313, revd 445 US 573, on remand 51 NY2d 169).
But here the “inevitable discovery” was not of something the police in any event would have obtained through an independent untainted source (cf. People v Fitzpatrick, 32 NY2d 499, 507, cert den 414 US 1050 [search of closet in which gun was found would have taken place irrespective of illegal questioning of the defendant]; People v Payton, supra [routine systematic police investigation of gun dealers would have led to witness irrespective of illegal seizure of bill of sale from defendant’s apartment]), The People do not suggest any other means by which they would have gained possession of the contraband in question except for the by now tainted search of the bedroom and basement. Once so flawed, it could not be reincarnated as a hypothetical untainted one. Were the rule otherwise, every warrant-less nonexigent seizure automatically would be legitimatized by assuming the hypothetical alternative that a warrant had been obtained. Without the deterrment effect of the exclusionary rule, in such circumstances the constitutional warrant procedure for shielding Americans from unreasonable searches and seizures would be a shambles.
Finally, we cannot say that the erroneously unsuppressed products of the bedroom and basement searches were harmless. The defendant took the stand to testify to an exculpatory version of the events and apparently enough of the jurors were sufficiently impressed by his defense that, before the ultimate verdict brought their lengthy deliberations to an end, they had reported that they were at an impasse. This hardly supports the contention that there was “no reasonable possibility” that the errors contributed to the conviction (People v Almestica, 42 NY2d 222, 226).
For all these reasons, the order of the Appellate Division should be reversed, the motion to suppress granted to the extent indicated in this opinion, and the matter remitted to the Suffolk County Court for further proceedings on the indictment.*

 The defendant also seeks to vitiate the indictment on the ground that the People, through their agent Botway, had deprived him of due process by *699 “egregious foul play”, which he would have us equate with that which we condemned in People v Isaacson (44 NY2d 511, 521-522). This contention is not supported by the record. Among other things, it does uphold the conclusion that the defendant importuned the informer to engage in the illicit enterprise and not the other way around. And, there surely is no constitutional protection against misplaced “friendships” (cf. Hoffa v United States, 385 US 293; People v Cardona, 41 NY2d 333). Moreover, in all, the ultimate goal of the police activity was consistent with legitimate law enforcement objectives (People v Archer, 68 AD2d 441, affd 49 NY2d 978, cert den 449 US 839).