515 So.2d 101 (1987)
Kenneth Joseph FORTIER, Jr.
v.
STATE.
6 Div. 726.
Court of Criminal Appeals of Alabama.
April 28, 1987.
Rehearing Denied June 9, 1987.
Certiorari Denied September 25, 1987.
Certiorari Denied January 25, 1988.
*103 Thomas M. Goggans of Goggans, McInnish, Bright & Chambless, Montgomery, for appellant.
Charles A. Graddick, Atty. Gen., and Victor Jackson, Asst. Atty. Gen., for appellee.
Alabama Supreme Court 86-1210 and 86-1211.
Certiorari Denied January 25, 1988. See 108 S.Ct. 776.
BOWEN, Presiding Judge.
Kenneth Joseph Fortier, Jr., was convicted of robbery in the first degree and sentenced as a habitual offender to life imprisonment without parole. He presents four issues on appeal.
The State's evidence established that in the early morning hours of July 22, 1984, Jagjeet Sidhue, Rajesh Khedekar, and Sandeep Sharma, three University of Alabama students, were leaving the Zoo, a local campus nightspot, when a young woman identified as Tammy Gamso approached and began to talk to Sidhue. She told him that she was waiting for two male friends. She turned around and two black males, at least one of whom was holding a pistol, accosted Sidhue, Khedekar, and Sharma, demanded and obtained the wallets belonging to the three students, and fled in the direction of a light-colored older model Mercedes-Benz parked nearby. None of the three victims was able to positively identify the defendant as one of the assailants. Sharma testified that, although he could not be sure, he thought the defendant "looked like" one of the two men who had robbed him and his companions.
Tammy Gamso testified that she, Wayne Donnell Jones, and the defendant went to the Zoo bar on the evening of July 21, 1984, in the defendant's car, an older model blue Mercedes. As they left she met and talked with a foreigner and then walked back to the Mercedes, where she heard Jones tell the defendant that he "wanted the gun." Ms. Gamso stated that she "reached out to Wayne [Jones] and told him not to and he just pulled away." Jones and the defendant then left the car and headed in the direction of the foreigner with whom Ms. Gamso had spoken earlier.
Ms. Gamso was picked up about a block away by Jones and the defendant, who gave her a credit card bearing Sharma's name. She was apprehended several hours later after she attempted to purchase gasoline with the stolen credit card. Shortly after the police arrested her, she saw Jones and the defendant, wearing the same clothes they had worn during the robbery, drive by in the defendant's Mercedes. Fifteen minutes later, wearing different clothes, they drove by again, stopped and walked over to Ms. Gamso, and were taken into custody by the police. The Tuscaloosa police officer who apprehended them stated that they had alighted from an older model light blue Mercedes.

I
The defendant maintains that there was insufficient evidence to convict him of robbery by the use of force as charged in the indictment because (1) aiming a gun at the victims established only a threat of the use of force; (2) the testimony of accomplice Tammy Gamso was uncorroborated; and (3) he was not positively identified by any of the victims.
In Lewis v. State, 469 So.2d 1291 (Ala.Cr.App.1984), affirmed sub nom. Ex parte Blake, 469 So.2d 1301 (Ala.1985), this court held "as a matter of law, that brandishing [a] weapon constitute[s] both the use of force and the threat of force.... [A]iming a gun at the victim constitutes either the force or the intimidation required for robbery." 469 So.2d at 1298. See also Shedd v. State, 505 So.2d 1306 (Ala.Cr.App. 1987).
The defendant never directed the trial court's attention to the issue of accomplice corroboration. At the close of the State's case he moved for a "judgment of acquittal on all charges" without stating grounds, and, in the alternative, he requested charges on lesser included offenses. He argued his alternative request and provided the court with a citation of authority allegedly *104 supporting the giving of lesser included offense charges. Following his conviction he filed a "Motion for Judgment of Acquittal After Verdict" pursuant to Rule 12.3, A.R.Cr.P.Temp. "on the grounds that there was insufficient evidence to convict defendant." The court charged the jury that whether or not Tammy Gamso was an accomplice was a question of fact for their determination and then outlined for the jury the principles requiring corroboration of accomplice testimony. The defendant made no objections to this part of the court's oral charge and tendered no requested charges defining "accomplice" or stating the necessity for corroboration of an accomplice's testimony. Under the law prevailing prior to Ex parte Maxwell, 439 So.2d 715 (Ala.1983), and Rule 12.3, A.R.Cr. P.Temp., the defendant would not have preserved the issue of corroboration for our review. See Ward v. State, 376 So.2d 1112, 1115-16 (Ala.Cr.App.), cert. denied, Ex parte Ward, 376 So.2d 1117 (Ala.1979). See also Alexander v. State, 281 Ala. 457, 458, 204 So.2d 488, 489-90 (1967) cert. denied, 390 U.S. 984, 88 S.Ct. 1107, 19 L.Ed. 2d 1284 (1968). Compare Dunnaway v. State, 479 So.2d 1331, 1336-37 (Ala.Cr.App. 1985).
However, in Maxwell, the Alabama Supreme Court held the following:
"To preserve the issue for appeal, it is necessary for defendant to state his grounds upon moving to exclude evidence; however, it is not necessary to draw the trial court's attention to the particular defect. It is sufficient that the defendant state the ground that the prosecution has failed to make a prima facie case." 439 So.2d at 717.
Although the defendant's first motion for judgment of acquittal (made at the close of the State's case) stated no grounds, his post-verdict motion was based upon the claim that there was "insufficient evidence to convict defendant." Rule 12.3(a) states that "[i]t shall not be necessary to the making of the motion after a verdict or judgment of conviction that a similar motion have been made prior to the submission of the case to the factfinder." If a defendant is not precluded from testing the sufficiency of the State's case via a post-verdict motion under Rule 12.3 by his failure to have made an earlier motion under Rule 12.2, then it follows that he is not foreclosed from challenging the State's case by way of grounds stated in a Rule 12.3 motion which were not advanced in his earlier Rule 12.2 motion. We must, therefore, determine whether the State's case was legally sufficient insofar as it related to the accomplice corroboration issue.
The first question is whether Tammy Gamso was an accomplice.
"Whether a witness is an accomplice may be a question of law or fact, depending on the circumstances. Doss v. State, 220 Ala. 30, 123 So. 231 (1929). However the question of complicity is usually a question of fact; it becomes a question of law only where the court is clearly convinced by a preponderance of the evidence that the witness could have been indicted and convicted of the same charge of a felony for which the defendant is on trial and that the witness freely participated in the crime. Where there is no conflict in the testimony, the question of whether a witness is an accomplice is a question of law for determination by the trial court. Pryor v. State, 47 Ala. App. 706, 260 So.2d 614 (1972).
"`The question of law for the court resolves itself into one of undisputed evidence. If this, taken altogether most favorably toward the noncomplicity of the witness, still leaves unchallenged acts which would support a verdict of guilt of the witness, then the court, if requested, must require the State to adduce corroboration.'
Leonard [v. State], supra, 43 Ala.App. [454], 464, 192 So.2d [461], 469 [1966].
"Thus where there is doubt or dispute whether a witness is in fact an accomplice, the question is for the jury and not the trial court. Skumro v. State, 234 Ala. 4, 170 So. 776 (1936). Where there is doubt whether a witness is in fact an accomplice, and the testimony is susceptible to different inferences on that point, that question is for the jury. Sweeney v. *105 State, 25 Ala.App. 220, 143 So. 586 (1932); Horn v. State, 15 Ala.App. 213, 72 So. 768 (1916)." Jacks v. State, 364 So.2d 397, 403 (Ala.Cr.App.), cert. denied, Ex parte Jacks, 364 So.2d 406 (Ala.1978).
Tammy Gamso neither admitted nor denied her participation in the robbery. She testified to her presence at the scene, her conversation with one of the victims, her attempt to dissuade Jones from leaving the car with the gun, and her knowing receipt and use of the property taken in the robbery. Compare Yarber v. State, 375 So.2d 1229, 1230 (Ala.1978) (where witness denied his participation in crime for which defendant was charged, complicity was a disputed question of fact for the jury); Daniels v. State, 50 Ala.App. 88, 91, 277 So.2d 364, 367 (1973) (where witness was present at the scene of the crime but denied intent to commit the offense, complicity was a jury issue); Jacks v. State, supra (where witness was present at scene of offense and denied prior knowledge of companion's intent to commit the crime but admitted to acts making him an accessory after the fact, question whether he was an accomplice was for the jury).
While "mere presence of a witness at the scene of a crime where he does nothing to aid and abet is insufficient to show him to have been an accomplice," Daniels v. State, 277 So.2d at 367; Jacks v. State, supra, the jury may have believed that Ms. Gamso's engaging one of the victims in conversation immediately prior to the robbery amounted to more than mere presence and constituted a ploy to distract the victims' attention as a means of facilitating the offense. On the other hand, when viewed in connection with Ms. Gamso's later testimony that, as Jones left the defendant's car with a gun, she reached out and "told him not to," Ms. Gamso's conduct may have been viewed by the jury as noncomplicitous in the robbery itself.
The fact that Ms. Gamso received and attempted to use the victim's property, knowing it to have been stolen, does not make her an accomplice to the robbery unless she knew in advance that the robbery would be committed and intended to aid and abet its commission. See Humber v. State, 466 So.2d 165 (Ala.Cr.App.1985).
"The generally accepted rule is that `one who knowingly receives stolen property from the thief is not to be treated as an accomplice of the thief for purposes of corroboration in a trial of the thief for the principal offense.' ...
"An exception to this general rule is that `a receiver of the stolen property is an accomplice of the thief for purposes of corroboration whenever there has been a prearranged plan or conspiracy between the receiver and the thief concerning the theft of, and subsequent purchase of, the property.' ... `[T]he receiver is an accomplice where he knew in advance that the theft would be committed, and agreed to receive the property which might be stolen.' ...' `[W]here the receiver participated in the theft as by aiding, abetting, or inducing it, or by joining in a prearranged plan whereby one is to steal the property and the other is to buy it, he is an accomplice of the thief.'" Humber v. State, 466 So.2d at 166-67 (citations omitted).
Based on the foregoing principles, Ms. Gamso's testimony was susceptible to different inferences regarding whether or not she was an accomplice in the robbery. Therefore, she was not an accomplice as a matter of law. See Yarber v. State, supra; Humber v. State, supra; Jacks v. State, supra; Daniels v. State, supra. "In order for a defendant to invoke the § 12-21-222 prohibition mandating corroboration of an accomplice's testimony, the evidence must present an undisputed question of fact for the trial judge that the witness giving the testimony is an accomplice." Washington v. State, 401 So.2d 236, 239 (Ala.Cr.App.), cert. denied, Ex parte Washington, 401 So.2d 241 (Ala.1981).
Our conclusion that Ms. Gamso's complicity was a disputed question properly submitted to the jury means that the court's denial of appellant's motion for judgment of acquittal was not error. As we observed in Washington v. State:
"Because this issue remained a question for the jury, the denial of the appellant's *106 motion to exclude the State's evidence for insufficient corroboration was not error. The jury was appropriately charged, the issue was placed fairly before them, and was determined adversely to appellant. Having determined that the issue of whether the witness was an accomplice presented a question of fact for the jury, we pretermit discussion of the sufficiency of the corroborative evidence." Washington v. State, 401 So.2d at 239-40. See also Jacks v. State, 364 So.2d at 404; Daniels v. State, 277 So.2d at 367.
The defendant's final challenge to the sufficiency of the State's evidence that none of the victims identified him as one of the assailantsis also unavailing. "The failure of a victim to identify the accused affects the weight and credibility of the victim's testimony, which are questions for the jury." Brown v. State, 488 So.2d 9, 11 (Ala.Cr.App.1986); Johnson v. State, 453 So.2d 1323, 1328-29 (Ala.Cr.App. 1984). It is not indispensable to a conviction to have positive eyewitness identification of the accused. Identity may be established by direct or circumstantial evidence, Cummings v. State, 356 So.2d 779, 783 (Ala.Cr.App.1978), and if there is enough evidence to permit the inference that the accused was the person who committed the crime then the State's case is sufficient, United States v. Darrell, 629 F.2d 1089, 1091 (5th Cir.1980).
Aside from the testimony of Ms. Gamso, which was sufficient in itself to identify the defendant as a perpetrator of the robbery, the State presented the additional circumstantial evidence that, several hours after a robbery in which two black males were believed to have fled in a light-colored older model Mercedes, the defendant and another black male alighted from an older model light blue Mercedes at the location where Ms. Gamso was attempting to use a credit card stolen in the robbery. The State's evidence was sufficient to establish a prima facie case of robbery in the first degree.

II
The trial court refused to give the defendant's requested charge number 14, which reads as follows:
"Ladies and gentlemen of the jury, I charge you that testimony concerning the identity of a person charged with a crime is to be scrutinized with extreme care. No class of testimony is more uncertain and less to be relied upon than that of identity.
"The possibility of human error or mistake, and the probable likeness or similarity of objects and persons are factors that you must consider in evaluating testimony as to identity. You must be satisfied beyond a reasonable doubt and to a moral certainty as to the accuracy of the witnesses' identification of the defendant."
In view of the fact that all of the victims stated that they could not identify the defendant, this charge was abstract and its refusal was not error.
The foregoing charge is appropriately given in cases in which there is the possibility of tainted identification testimony based, for example, upon the suggestiveness of a pretrial identification procedure, see, e.g. Henderson v. State, 373 So.2d 1218, 1220 (Ala.Cr.App.), cert. denied, Ex parte Henderson, 373 So.2d 1221 (Ala. 1979), or in cases in which the accuracy of the witness's identification of the defendant is contested via cross-examination or the testimony of other witnesses, see, e.g. Rowser v. State, 346 So.2d 533, 535-36 (Ala.Cr.App.), cert. denied, Ex parte Rowser, 346 So.2d 536 (Ala.1977).
When the witnesses have expressly stated that they are unable to identify the defendant, it is nonsensicalif not actually harmful to the defendantto warn the jury that they must be morally certain of the "accuracy of the witnesses' identification of the defendant."

III
The defendant claims that the admission of a .38-caliber automatic pistol found during a search of his apartment violated his Fourth Amendment right to be free from *107 unreasonable searches and seizures and his Fifth Amendment right to counsel. He claims that the seizure of the firearm was tainted by his prior arrest without probable cause and by his involuntary consent to search his apartment. He also maintains that the discovery of the weapon stemmed from police interrogation following his invocation of the right to counsel. We hold that the defendant's arrest was based on probable cause. We need not decide whether he voluntarily consented to a search of his apartment because his conviction must be reversed on the ground that the incriminating evidence was found as a direct result of police interrogation after he unequivocally invoked his right to counsel.
Following a robbery during which a gasoline credit card was taken from one of three University of Alabama students at 1:00 a.m., the University police were notified that two black males, seen in the company of a blonde female wearing a white dress with a large black belt, fled in the direction of a light-colored older model Mercedes. Approximately four hours later, Tuscaloosa police authorities apprehended a white female matching the foregoing description as she attempted to purchase gasoline with the victim's credit card. While the female suspect was being questioned, two black males drove up in a light blue older Mercedes, approached the female and asked what was going on.
Under the circumstances, the defendant's connection with the vehicle, see Campbell v. State, 354 So.2d 325 (Ala.Cr.App.1977), and with the suspect who was attempting to use the stolen property, compare United States v. Willis, 759 F.2d 1486, 1498 (11th Cir.), cert. denied, 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985) (probable cause to arrest defendant for possession of contraband on plane came from pilot of plane who displayed defendant's motel room key), clearly warranted the Tuscaloosa police officers' believing that the defendant was one of two black males who had committed the earlier robbery. "Probable cause to arrest exists when, at the time the... officer makes the arrest, there are reasonably trustworthy facts and circumstances sufficient, given the totality of the circumstances, to lead a reasonable person to believe there is a fair probability that the suspect is committing or has committed an offense." Fifteenth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals, 1984-1985, 74 Geo.L.J. 499, 518 (1986).
During the hearing on the motion to suppress, Lieutenant Larry Montgomery of the University Police Department testified that after he informed the defendant of his Miranda rights the defendant said that he did not want to make any statements without a lawyer present. Lieutenant Montgomery did not question the defendant further at that time. Approximately two hours later, Montgomery "had the defendant brought back in order to explain the search warrant procedure" to him.
In doing an inventory of the defendant's personal effects, Lieutenant Montgomery had come across a bill of sale for a .38-caliber automatic pistol. The defendant testified at the suppression hearing that, upon being brought back to Montgomery's office, he was asked by Montgomery whether the weapon described in the bill of sale was the one used during the robbery. According to the defendant, Montgomery also said it would be "helpful" if the defendant would "take him where the gun was rather than him having to prepare the search procedure." At the suppression hearing, Lieutenant Montgomery testified as follows:
"I explained the procedure of writing up the search warrant, ... [how] I would have to make an affidavit and get the warrant judge out of bed, this being Sunday morning, to issue me a search warrant for that particular address. I explained to him also how much trouble it was to write one up for me since I don't write that many, and then after I explained"
Lieutenant Montgomery's testimony on this point during the suppression hearing was cut short by further questioning by the assistant district attorney. Nevertheless, at trial Lieutenant Montgomery stated the following:

*108 "Q [By defense counsel]: Now, did you tell himdidn't you tell him that it would be helpful if he would take you to where the gun was?
"A I told him that it would save me a lots of trouble, yes.
"Q Save you lots of trouble?
"A Yes, in writing things down.
"Q Lots of trouble, so he was trying to help you out by taking you to where the gun was, is that what you think?
"A Yes, sir.
". . .
"Q [By defense counsel]: And is it not true that you told him it would be helpful if he would take you voluntarily to where the gun was?
"A [By Lieutenant Montgomery]: Helpful to me without having to doto write up the search warrant."
"[A]n accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378 (1981). Because the defendant clearly invoked his right to counsel when he stated that he did not wish to make any statements without a lawyer present, and because the defendant clearly did not initiate further conversation with the police (Lieutenant Montgomery "had" the defendant brought back to him), we need only determine whether the defendant was "interrogated" by Montgomery.
"[T]he term `interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 301-02, 100 S.Ct. 1682, 1689-90, 64 L.Ed.2d 297 (1980) (emphasis in original).
In Innis, the defendant invoked his right to counsel and was transported in a police vehicle with at least two officers. When one officer mentioned to another officer that it would be tragic if the gun used in the offense for which the defendant had been arrested were to be found by one of the students at a nearby school for handicapped children, the defendant immediately led the officers to the weapon. The Supreme Court held that the officer's comment was not "reasonably likely to elicit an incriminating response" and did not constitute interrogation.
Aside from the distinctions between the Fifth Amendment right to counsel and the Sixth Amendment right to counsel, see Rhode Island v. Innis, 446 U.S. at 300 n. 4, 100 S.Ct. at 1689 n. 4, the result in Innis is difficult to square with the result in Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the "Christian burial speech" case, see Stahl v. State, 426 So.2d 909, 916 (Ala.Cr.App.1982), cert. quashed, Ex parte Stahl, 426 So.2d 917 (Ala.), cert. denied, 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983). Nevertheless, the divergent outcomes may be accounted for by at least three factual distinctions relevant here, namely: (1) In Innis, there were no indication that the police knew of the defendant's particular concern for handicapped children, 446 U.S. at 302, 100 S.Ct. *109 at 1690, whereas in Brewer the officer was aware of the defendant's religious sensibilities, 430 U.S. at 402-03, 97 S.Ct. at 1241-42; (2) In Innis, the comment was ostensibly addressed to someone other than the defendant, while in Brewer the statements were made directly to the defendant, the only other person present; and (3) In Innis there was no evidence to suggest that the "remarks were designed to elicit a response," 446 U.S. at 301-02 n. 7 and 303 n. 9, 100 S.Ct. at 1689-90 n. 7 and 1690 n. 9, whereas in Brewer the court found that the officer "deliberately and designedly set out to elicit information" from the defendant, 430 U.S. at 399, 97 S.Ct. at 1240.
In the present case, the address for the defendant listed on the firearm receipt was different from the one the defendant had given at the time of his arrest. At that time, the defendant had stated that he lived with his aunt and grandmother. Lieutenant Montgomery had received yet a third address for the defendant from Tammy Gamso. In an apparent attempt to have the defendant relate his correct address, Lieutenant Montgomery told the defendant that, whatever residence was searched pursuant to the warrant, the police would have to follow the ensuing procedure:
"[W]e would have to search every part of that house that was large enough to contain a handgun throughout the house and if we didn't find it we would have to go through everything in the house.
"Q When you say you would have to go through everything in the house, would you have to go through all the drawers?
"A Yes, sir.
"Q You would have to go pulling cushions out of furniture?
"A I'm not sure whether I told him that, but we would have to not destroy anything but to take the cushions and stuff out, sure would, any place that could contain a handgun."
Lieutenant Montgomery testified that he "assumed at least the [defendant's] grandmother was maybe an elderly lady" and he noticed that "it seemed to bother" the defendant that a search would be conducted at the residence of his aunt and grandmother.
"A [By Lieutenant Montgomery]: ... He seemed to be worried that we would have to go down to his aunt's house.
"Q [By assistant district attorney]: Did he tell you that or just your perception in watching?
"A Perception mostly, his mannerisms and the way he acted after I explained that, and then only I guess a minute or so passed and he told me that he would take me and show me where the gun was at."
Unlike the officers in Innis, who had no reason to suspect that the defendant was "unusually disoriented or upset at the time of his arrest," 446 U.S. at 302-03, 100 S.Ct. at 1690-91, or would be especially susceptible to an appeal for the safety of handicapped children, 446 U.S. at 302, 100 S.Ct. at 1690, it is clear that Lieutenant Montgomery was aware that the defendant was "bothered" and "worried" at the prospect of his aunt's and grandmother's residence being searched. Focusing, therefore, on the subjective "perceptions of the suspect," it is evident that Lieutenant Montgomery should have known that his remarks to the defendant were reasonably likely to evoke an incriminating response. Compare Ex parte Stahl, 426 So.2d at 917-18 (suspect not subjectively likely to have responded as he did to exchange with police). Unlike the situation in Innis, Lieutenant Montgomery's comments were also directly addressed to the defendant and appear to have been "designed to elicit a response," 446 U.S. at 301-02 n. 7 and 303 n. 9, 100 S.Ct. at 1689-90 n. 7 and 1690 n. 9. Montgomery's comment that it would "save [him] lots of trouble ... in writing things down" if the defendant would show him where the gun was can only be interpreted as a deliberate attempt to elicit the whereabouts of the weapon in order to save himself the trouble of going through the warrant procedure and having to search at least one and possibility three residences.
The defendant's response to Montgomery's interrogation did not constitute a waiver of his previously invoked Miranda *110 rights. Although the defendant (but not Lieutenant Montgomery) testified that he was readvised of his rights upon being "brought back" to Montgomery's office, "a valid waiver of [the Miranda ] right cannot be established by showing only that [the defendant] responded to further police-initiated custodial interrogation even if he has been advised of his rights." Edwards v. Arizona, 451 U.S. at 484, 101 S.Ct. at 1885.
We therefore hold that the pistol was discovered as a direct result of interrogation in violation of the defendant's Fifth Amendment right to counsel. Its admission was reversible error for which the defendant is entitled to a new trial.

IV
The defendant argues that the State did not properly prove, for purposes of habitual offender sentencing, that he had been convicted of three prior felonies. We need not address this issue because reversal is required on grounds just discussed. However, we note that the proof of the out-of-state convictions did not comply with Ala. Code 1975, § 12-21-70. With regard to the defendant's admission of the prior felony convictions, we direct attention to Webb v. State, [Ms. 3 Div. 329, April 28, 1987] (Ala. Cr.App.1987).
REVERSED AND REMANDED.
All Judges concur.

ON REHEARING
BOWEN, Presiding Judge.
Contrary to the Attorney General's argument, the "inevitable discovery" exception to the exclusionary rule, sanctioned in Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), does not change the result here. In Nix, the Supreme Court held evidence of a murder victim's body, discovered as a result of a violation of the accused's Sixth Amendment right to counsel, admissible because, at the time the violation occurred, a search party had neared the site of the body and would have located it within several hours. "Except for the application of its rule to the specific facts before the Court and its holding that the Government must establish the inevitability of discovery by a preponderance of the evidence, the Supreme Court was silent as to what constitutes an `inevitable' discovery under the doctrine." United States v. Satterfield, 743 F.2d 827, 846 (11th Cir.1984), cert. denied, 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985). See also The Supreme Court, 1983 Term, 98 Harv.L.Rev. 87, 129 (1984) (the Supreme Court "failed to specify [in Nix ] necessary criteria for determining `inevitability')."
At the very least, the Nix opinion indicates that the word "inevitable" is to be taken literally. "[I]nevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment...." Nix v. Williams, 467 U.S. at 445 n. 5, 104 S.Ct. at 2509 n. 5.
"The significance of the word `would' cannot be overemphasized. It is not enough to show that the evidence `might' or `could' have been otherwise obtained. Once the illegal act is shown to have been in fact the sole effective cause of the discovery of certain evidence, such evidence is inadmissible unless the prosecution severs the causal connection by an affirmative showing that it would have acquired the evidence in any event. In order to avoid the exclusionary rule, the government must establish that it has not benefited by the illegal acts of its agents; a showing that it might not have so benefited is insufficient." Musgrove v. State, [Ms. 8 Div. 345, Oct. 14, 1986] (Ala.Cr.App.1986) (quoting Maguire, "How to Unpoison the FruitThe Fourth Amendment and the Exclusionary Rule," 55 J.Crim.L.C. & P.S. 307, 315 (1964) (emphasis in original). See also W. LaFave, Search and Seizure, § 11.4(a) at 384 (2d ed. 1987).
There was no evidence presented in the present case to prove that, absent the illegal questioning of the defendant as to the whereabouts of the gun, the police would have obtained a warrant for the place where the weapon was found and would *111 have eventually located the gun. The prosecution simply did not meet its burden of proof. Nix v. Williams, 467 U.S. at 444, 104 S.Ct. at 2509 (the prosecution must "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means"); United States v. Cherry, 759 F.2d 1196, 1207 (5th Cir.1985), cert. denied, Cherry v. United States, ___ U.S. ___, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987). ("It is firmly established that, once the defendant goes forward with specific evidence demonstrating taint, the government has the final burden of persuasion to show that the evidence is untainted"). Although Lieutenant Montgomery was in the process of writing an affidavit for a search warrant at the time he interrogated the defendant and he could have completed it, presented it to a magistrate, and he might have secured a search warrant, the fact that he did not follow that course of action makes any discussion about what he could or might have done a focus on "speculative elements" rather than "demonstrated historical facts," Nix v. Williams, 467 U.S. at 445 n. 5, 104 S.Ct. at 2509 n. 5. Compare United States v. Levasseur, 620 F.Supp. 624, 632 (E.D.N.Y.1985) (court did not need to resort to speculation in case where affidavit for search warrant was being drafted at the time the illegality occurred because a warrant was ultimately issued and there was no attempt to evade the Fourth Amendment). See also Commonwealth v. Benoit, 382 Mass. 210, 415 N.E.2d 818, 821 (1981) ("It is possible to surmise that the police may have failed to obtain a warrant in reliance on a mistaken belief that they had obtained a valid consent to search from the defendant").
"[T]he alternate means of obtaining the evidence must at least be in existence and, at least to some degree, imminent if yet unrealized. If the inevitable discovery exception can be applied only on the basis of the police officer's mere intention to use legal means subsequently, the focus of the inquiry would hardly be on historical fact." United States v. Cherry, 759 F.2d at 1205 n. 10.
"Were the rule otherwise, every warrantless nonexigent seizure automatically would be legitimatized by assuming the hypothetical alternative that a warrant had been obtained." People v. Knapp, 52 N.Y. 2d 689, 439 N.Y.S.2d 871, 876, 422 N.E.2d 531, 536 (1981).
"While suppression in such a case may put the prosecution in a worse position because of the police misconduct, a contrary result would cause the inevitable discovery exception to swallow the rule by allowing evidence otherwise tainted to be admitted merely because the police could have chosen to act differently and obtain the evidence by legal means. When the police forgo legal means of investigation simply in order to obtain evidence in violation of a suspect's constitutional rights, the need to deter is paramount and requires application of the exclusionary rule." United States v. Cherry, 759 F.2d at 1205 (emphasis added).
We find the deterrence function of the exclusionary rule particularly compelling in this case because of our conclusion that Lieutenant Montgomery's interrogation of the defendant was "a deliberate attempt to elicit the whereabouts of the weapon in order to save himself the trouble of going through the warrant procedure and having to search at least one and possibly three residences." Ante at 109. Given Lieutenant Montgomery's stated reluctance to go through the "trouble" of "writing things down," and "get the warrant judge out of bed," we cannot assume that his illegal questioning of the defendant was anything other than an intentional shortcut to the warrant procedure. "If the [inevitable discovery] rule were applied when such a shortcut was intentionally taken, the effect would be to read out of the Fourth Amendment the requirement that other, more elaborate and protective procedures be followed." W. LaFave, Search and Seizure § 11.4(a) at 382 (2d ed. 1987).
Although the Supreme Court rejected the notion in Nix that the prosecution must prove the absence of bad faith, 467 U.S. at 445, 104 S.Ct. at 2510, it did not state that the presence of intentional misconduct was *112 irrelevant. The Court merely pointed out that normally "there will be little to gain from taking any dubious `shortcuts' to obtain the evidence." Nix, 467 U.S. at 446, 104 S.Ct. at 2510. Other federal and state courts faced with an intentional bypass of the Fourth Amendment warrant requirement have declined to apply the inevitable discovery exception. See, e.g., United States v. Cherry, 759 F.2d at 1205 (5th Cir.1985); United States v. Satterfield, 743 F.2d at 846 ("Because a valid search warrant nearly always can be obtained after the search has occurred, a contrary holding would practically destroy the requirement that a warrant for the search of a home be obtained before the search takes place.") (emphasis in original); State v. Johnson, 301 N.W.2d 625, 629 (N.D.1981) ("If the inevitable discovery theory applied when a shortcut was taken, as in the instant case, the net result would be that the magistrate's determination of probable cause as required by the fourth amendment would be eliminated for all practical purposes. This we cannot do.").
OPINION EXTENDED; APPLICATIONS FOR REHEARING OVERRULED.
All Judges concur.