People v Lugo (2004 NY Slip Op 50126(U))

[*1]

People v Lugo

2004 NY Slip Op 50126(U)

Decided on March 5, 2004

Supreme Court, Kings County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 5, 2004

Supreme Court, Kings County
 THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff,
against
RENE LUGO, Defendant.
INDICT. NO. 2428/03

JOSEPH KEVIN McKAY, J.
INTRODUCTION
This was a Mapp-Dunaway-Payton-Huntley hearing held before me on February 18 and 19, 2004, on defendant's motion to suppress a firearm, which was the fruit of a warrantless search of his apartment and two statements he made to detectives at the 83rd Precinct on the night of his arrest, April 2, 2003. The evidentiary record consists of the testimony of Detective Ryan and Detective Barragan, both of the 83rd detective squad, and defendant Rene Lugo, as well as the Miranda rights sheet and defendant's written statement.
Part of Detective Ryan's testimony was heard in camera , as a modified
Darden hearing, to protect the identity, confidentiality and safety of the confidential informant ( "c.i."). The existence of the c.i. was conceded. Many questions were submitted by defense attorney Stoll and were all put to the witness in camera. The Court summarized the testimony for the record in open court in a manner that provided the defense with a great deal of information, but safeguarded the identity of the c.i. From the entire record I now make the findings and conclusions which follow.
FINDINGS OF FACT
At about 10:50 a.m. on April 2, 2003 Detective Ryan met the c.i. at his office in the 83rd Precinct detective squad. He knew the c.i. for several months and the c.i. had given information previously which had resulted in arrests and, he believed, indictments. The c.i. told him, from fresh firsthand information not more than four days old, that the subject, one Antonio Lugo of 262 Cornelia Street, Apt 3L, in Brooklyn, had made or nearly finished making one or more pipe bombs stored in his apartment, along with unidentified chemicals used for this process, and had plans to detonate one in Manhattan as part of a suicide, probably in the not too distant future when his friends got out of jail. The c.i. also told Detective Ryan that there were handguns stored somewhere in that same apartment and that one of them may have been used in a shooting a month earlier. The information also included references to the subject being despondent. Clearly this was a serious situation to be handled expeditiously by the police.
[*2] Detective Ryan thereupon took prudent steps to investigate and act on this information. He spent several hours with the c. i. going over the information, doing a computer check on the apartment building in question, and going to the building itself to observe its layout, entrances, exits and the like. He conferred with his supervisors and then called the Kings County District Attorney's Office to begin the process of obtaining a search warrant. He was told to bring the c.i. with him to the District Attorney's office. He spent an hour and a half to two hours there while one or more Assistant District Attorneys interviewed the c.i. and the detective and conferred with their supervisors. At the conclusion of these conferences Detective Ryan was advised that "based on the nature of the possibility of explosives" a search warrant would not be needed at this time ( Hearing Transcript at 15).
The next series of steps taken by Detective Ryan were done back at the
precinct where he again conferred with his supervisors, who assembled members of the arson and explosion unit, the bomb squad and other police personnel to map out a plan of attack. Sometime during those meetings an arson detective spoke with the
c.i., who concluded that it was "conceivable" that the subject had been actually
fabricating a homemade pipe bomb.
It was not until approximately 8 p.m. that same day that the planning and coordination was completed and the necessary specialized personnel were in place and instructed to enable the police to enter the subject apartment. The emergency service unit ( "ESU"), having secured the block and the building, was the first to enter, followed by members of the arson and explosion team and the bomb squad, with its canine unit. Once ESU was inside the apartment they secured all those present in handcuffs and led them outside. This included defendant, his son Antonio, who was the subject of this investigation, defendant's wife, daughter and a female family friend.It was only after ESU, the arson and explosion team and the bomb squad with their trained dogs had swept through the entire apartment, found no explosives of any kind and declared the apartment safe that Detective Ryan then entered to do his own search. He stated that he was searching for dangerous or explosive materials which the specialized units may have missed, as well as for handguns.[FN1]
 Nevertheless, it is obvious to the Court that his primary purpose was to search for handguns and to make arrests, if contraband was found. Unlike the specialized units, Detective Ryan was not an expert in nor trained in explosives or chemicals. It turned out that he found and recovered a .32 caliber handgun inside a pouch in an open safe in a curtained closet in the rear bedroom of the apartment.
The rest of Detective Ryan's testimony, as well as that of Detective
Barragan and defendant himself, centered on the time defendant spent in the precinct
that night and defendant's two statements. The first statement, only oral, was an
admission that defendant takes responsibility for the gun; the second explained
an earlier accidental shooting incident with that gun, and was written down by defendant at Detective Barragan's request. The detectives' testimony described
the administration of Miranda warnings to defendant orally and in writing, signed by
[*3]
defendant, in an exhibit showing the date and of time of the warnings as 4-2-03 at 2140 (9:40 p.m.), which was before defendant made any statements. Defendant admitted he knew about the Miranda rights and signed the exhibit but claimed it was only done after he made both statements about 1:00 a.m. Of the two versions, the
detectives' account seems more probable, but I will explain later the overall problems I have found with the voluntariness of these statements, factually and legally.
 Defendant's family was also taken to the precinct that night. His son Antonio was kept in a separate room on the second floor; at one time he was put in the
same cell as defendant. The others were kept downstairs. Defendant was constantly
concerned for their safety and hoped for their release, and he linked his willingness
to cooperate with the police by making his two statements entirely to his desire
to secure their release as soon as possible. More specifically, defendant testified that
Detective Ryan told him no one would be leaving until someone owned up to the gun.
Detective Ryan acknowledged defendant's concern for his family and told him they were downstairs and would be leaving the precinct. He denied that he conditioned their release on admissions about the gun. Here again there is a serious divergence of
testimony bearing on the voluntariness of the statements. I am not prepared to
accept in full defendant's version, but I cannot rule out entirely that his concern for his family may have been a significant motive for him to make statements to the police which might assure their release.[FN2]
CONCLUSIONS OF LAW
Warrantless searches, with only a few well-defined exceptions,
are per se unreasonable [ Mincey v Arizona, 437 U.S. 385 (1978)] and are presumptively unconstitutional [Schneckloth v Bustamonte, 412 U.S. 218 ( 1973); Katz v United States., 389 U.S. 347, 357 (1967) ], especially for searches of one's home. See, Payton v New York, 445 U.S. 573 (1980). The Assistant District Attorney in this case has claimed the police should be excused from the warrant requirement based on the "exigency" exception, relying on two cases: People v Vaccaro, 39 NY2d 468 ( 1976) and People v Hartford, 50 AD2d 1054 (3rd Dept. 1975 ). The latter is a motor vehicle case and, as even that decision itself recognizes, vehicle searches are covered by different rules. I therefore do not rely on Hartford , but will deal with Vaccaro below.
Courts generally distinguish between "exigency" and "emergency". The former involves the imminent loss or destruction of evidence or contraband, while the latter is primarily [*4]concerned with imminent danger to public safety.[FN3] This case presents "emergency" as opposed to "exigency" issues, which means that People v Mitchell, 39 NY2d 173 (1976), cert denied 426 US 953 (1976), and People v Molnar, 98 NY2d 328 (2002) are far more controlling than Vaccaro , supra. It is therefore with those cases in mind that I proceed to analyze the instant fact pattern. This necessarily is done with judicial hindsight, as part of the deliberative process. The court's role, however, is not merely a negative one, looking only backward to judge and sanction wrongful conduct or misguided decision-making by police or prosecutor, but
it is also forward-looking to furnish guidance for the future actions and decisions of law enforcement.[FN4]
The starting point for this analysis is the three-pronged test set forth by the Court of Appeals in Mitchell for the emergency exception to apply:
(1) The police must have reasonable grounds to believe
that there is an emergency at hand and an immediate
 need for their assistance for the protection of life or property.
(2) The search must not be primarily motivated by intent to
 arrest and seize evidence.
 (3) There must be some reasonable basis, approximating
 probable cause, to associate the emergency with
 the area or place to be searched [Footnote omitted ]
 People v Mitchell, supra, at 177-178.
Initially, I conclude that the third prong of probable cause to search the
apartment was satisfied.The first prong is more problematic. The situation was serious enough to demand expeditious police action, but to determine the element of immediacy the Court must weigh the information given to the police, the steps and time taken for them to respond and their ability to seek a search warrant without compromising public safety. Reasonable, relatively brief delays to enable the police to prepare for a safe entry do not necessarily render otherwise emergency situations non-emergent. See and compare, People v Salazar , 290 AD2d 256 (lst Dept 2002), lv denied 97 NY2d 760 (2002) [ reasonable for police to wait at the scene to gain entry into subject's apartment after witnesses on the street outside subject's window and officer's own observations of his violent conduct manifested a dangerous situation]; People v Stergiou , 279 AD2d 387 ( lst Dept 2001 ), lv denied, 96 NY2d 835 (2001)
[*5]
[police preparation to make emergency entry into apartment by removing peephole and breaking windows reasonable in case where subject threw a fire flare at police and set his own apartment on fire ]; People v Greenleaf, 222 AD2d 838 ( 3rd Dept. 1995), lv denied 87 NY2d 973 (1996) [ brief delay in getting key from next door landlord to enter apartment not inconsistent with emergency presented to police about a fight and cry for help minutes earlier inside subject apartment ]; In Matter of Pablo C., 220 AD2d 235 (lst Dept. 1995) [ two hour delay to gain entry into apartment reasonable where shots fired inside subject apartment were just reported by several witnesses].
 In the instant case, careful but expeditious police preparation to enter the premises safely would not alone take this search out of the emergency exception. But there is much more here than a mere one or two hour delay to prepare for safe entry.
 An emergency is a serious situation reasonably appearing to be on the verge of erupting - - which police may be able to stop or defuse by immediate action. The situation has to appear so volatile that applying for a search warrant is simply not consistent with reasonable and responsible police action.
 In this case the component of immediacy is missing. The information itself suggested a possible explosion of a pipe bomb in the future, although the police were also rightly concerned about a possible accident, if there really were dangerous chemicals in the apartment. Moreover, most of the actions taken that day by the police tend to show that the situation lacked immediacy. Most telling is not just the hours spent going over the c.i.'s information but the call and visit to the District Attorney's office. There, instead of preparing an affidavit and going to Court for a search warrant, they spent what could be considered an equivalent amount of time scrutinizing the c.i.'s information and credibility, thereby ignoring the Court's
constitutional responsibility to perform that function.
 There was no direct evidence provided about the thinking and decision-making process of the Assistant District Attorney and it was recognized during the hearing that it was now the Court's judgment, not the prosecutor's, which must prevail. Nevertheless, it is apparent from Detective Ryan's testimony that a prosecutorial judgment was made that because one or more pipe bombs were involved no search warrant was needed. It is not that simple. No explanation was offered for why a search warrant could not have been applied for at the time the c.i. was present in the D.A.'s office (except that it might take longer) or why the application could not have been made at the same time that the police department was mobilizing to enter the subject premises later in the day - - a process which took several more hours.
 The Court is not in a position to second-guess the careful planning, preparation and coordination needed by the various specialized police units to carry out their response. My judgment is limited to the conclusion that their response could easily have included an application for a search warrant, and was inconsistent
with a claimed imminent emergency. I therefore conclude that this case fails to satisfy the first prong of the Mitchell emergency exception to the warrant requirement.
 The final issue regarding this search and seizure concerns the entry and search by Detective Ryan. This occurred only after all the other specialized police teams had swept through the entire apartment and declared it safe. What emergency may have existed before this (and I have concluded it lacked the required immediacy throughout the day) was surely dissipated [*6]by this time. Notwithstanding other possible objectives for Detective Ryan's search, I have concluded that its main purpose was to search for guns and make arrests. Even though he possessed probable cause to look for guns, no persuasive reason has been offered by the prosecution to justify the failure to secure the premises at that point and seek judicial authorization,
notwithstanding some attendant inconvenience and delay. (Indeed, this problem would not have arisen had a search warrant been obtained earlier.)In other words, Detective Ryan's search failed to meet the first two prongs of the Mitchell test,[FN5] and as such constitutes an additional and independent basis to conclude that the reasonable bounds of any emergency exception to the search warrant requirement were exceeded. See, People v Knapp, 52 NY2d 689 (1981). See also , People v Manning , 301 AD2d 661 (2d Dept 2003), lv denied 99 NY2d 656 (2003 ); People v Guins , 165 AD2d 549 (4th Dept 1991), lv denied 78 NY2d 1076 (1991).
The statements made by defendant in the precinct that night are
clearly a direct result of the unlawful search, seizure and detention of defendant and are therefore inadmissible. The People's argument for attenuation is wholly misplaced. While spatially and temporarily removed from the seizure, the interrogation and the defendant's two statements during the continuously unlawful detention centered almost exclusively on the unlawfully seized weapon. As such, the statements were inextricably connected to that which was unlawfully seized and in no sense can the interrogation be said to have been purged of the illegality. Wong Sun
v United States, 371 US 471, 484-488 (1963). Cf., People v Rogers, 52 NY2d 527 , 532-533 (1981), cert denied 454 U.S. 898 (1981).
 In light of the aforesaid conclusion there is no need to make more detailed findings and conclusions regarding the voluntariness of the statements, the role of the family members' detention and the administration of Miranda warnings. As noted above, there was dramatically divergent hearing testimony on these subjects, particularly about when the Miranda warnings were given. While I am loath to believe that the detectives each gave less than candid testimony on this subject - - nor was their testimony incredible on its face, the defendant's testimony has created abiding reasonable doubt in my mind about the legality and voluntariness of his statements. Much of defendant's testimony appeared to me thoughtful, frank, plausible and often consistent with common sense and human experience, particularly given the charged atmosphere that must have existed in the 83rd Precinct that night. Therefore, as an alternative ground for suppression of both statements, I am constrained to conclude that the prosecution has not proven the voluntariness of these statements beyond a reasonable doubt. See, People v Anderson, 42 NY2d 35 (1977); People v Huntley, 15 NY2d 72 (1965).
For all of the above-stated reasons, defendant's motion to suppress the physical evidence is hereby granted. Since the suppressed firearm and the suppressed statements constitute the sole basis for the three counts in the indictment and without them the People have no triable case, the indictment is hereby dismissed.
[*7] The Clerk of the Court is directed to send copies of this Decision and Order to the Kings County District Attorney's Office and to defense counsel.
 IT IS SO ORDERED.
 E N T E R,

JOSEPH KEVIN McKAY
Decision Date: March 05, 2004
Footnotes

Footnote 1: It was part of a stipulation that even the canine unit could miss such materials if they were in sealed containers. 

Footnote 2: A recent resolution jointly sponsored by the New York County Lawyers' Association, and the Criminal Justice Section of the American Bar Association has called for the adoption by legislation or court rule of a national standard mandating the videotaping of all custodial interrogations by state and federal law enforcement authorities. Implementation of this proposal for defendant's interrogations that night
would have been a most welcome device to resolve the disputes which arose at this
hearing.

Footnote 3: Some cases appear to blur this distinction, particularly where the situation can be said to involve both imminent loss of contraband and imminent danger to public safety. See, People v Hodge, 44 NY2d 553 (1978); People v Calhoun, 49 NY2d 398 (1980 ).

Footnote 4: Here it is instructive to note that the prosecution must bear the burden of proof to justify a warrantless search [People v Brown, 96 NY2d 80, 90 n.6 (2001); People v Hodge, supra at 557], whereas the defense would have to do so to overcome the presumption of legality if a search warrant had been obtained. People v Corley, 122 AD2d 279 (2d Dept 1986), lv denied 68 NY2d 811 (1986); see also , People v Cohen , 90 NY2d 632,638 (1997).

Footnote 5: The prosecution has argued that Antonio's despondency and threat of suicide presented an independent ground for Detective Ryan's "emergency" search, but I conclude that this was insufficient to justify a warrantless search at that time.