In the Matter of TERRENCE G., a Person Alleged to be a Juvenile Delinquent,. Respondent. CITY OF NEW YORK, Appellant.

First Department, July 25, 1985

### APPEARANCES OF COUNSEL

*Elizabeth S. Natrella* of counsel (*Larry A. Sonnenshein* with her on the brief; *Frederick A. O. Schwarz, Jr., Corporation Counsel,* attorney), for appellant.

*Mary A. Clark* of counsel (*Lenore Gittis,* attorney), for respondent.

### OPINION OF THE COURT

MURPHY, P. J.

The issue is whether a juvenile lawfully detained by the police under the authority of Family Court Act § 718, a noncriminal statute whose purpose is the protection and return of runaway children, may legally be subjected to a "patdown" search. Respondent Terrence G. is the subject of a juvenile delinquency petition presented in the Family Court charging him with acts which would constitute (1) unlawful possession of a weapon by a person under sixteen (Penal Law § 265.05); and which if committed by an adult, would (2) constitute the crime of criminal possession of a weapon in the third degree (Penal Law § 265.02 [4]; *Matter of Terrence G.,* 123 Misc 2d 795 [Family Ct, NY County 1984]). Respondent moved to suppress certain physical evidence, i.e., a .22 caliber revolver and two live rounds of ammunition, found on his person during the patdown search in question. Following a *Mapp* hearing, the court below granted the motion to suppress, holding that it was an "unreasonable search" violative of respondent's right to privacy as guaranteed by the US Constitution 4th and 14th Amendments.

We disagree and would deny respondent's motion to suppress.

Respondent, who was 15 years old at the time, was standing on the mezzanine level of the 42nd Street and Eighth Avenue subway station adjoining the Port Authority building at 12:30 P.M. on a school day when he was approached by two New York City transit policemen affiliated with the truancy squad. The function of the truancy squad is to identify truants and runaways and to return these youngsters to school or to their parents.

The officer asked respondent his name and age, which he gave. The officers then asked why respondent was not in school; respondent replied that he had just gotten off a bus from South Carolina. The officer asked where respondent was staying in New York, to which respondent answered, "Nowhere."

The two officers then escorted respondent to a police room in the Port Authority, some 150 feet from where he had been standing. Inside the room one of the officers patted down respondent and readily found a .22 caliber revolver in the waistband of his pants. Youngsters are normally detained in the detention area while waiting to be transported to a school on West 48th Street where their status may be ascertained and arrangements made for their return to school or to a parent or legal guardian. The asserted purpose of the patdown is to find weapons which might injure the officers or other detainees.

Authority for respondent's detention is claimed from three statutes: Family Court Act § 718, "Return of runaway"; Interstate Compact on Juveniles article IV, "Return of Runaways" (L 1955, ch 155, § 1), and Education Law § 3213 (2) (a), "Arrest of truants". Respondent does not challenge the facial validity of these statutes and concedes that the circumstances gave the police a common-law right of inquiry with respect to him, but he contends that his behavior gave no cause for his detention or search.

■ Preliminarily, we reject respondent's contention that, because he now has left New York jurisdiction to return to South Carolina, the issue of the legality of the patdown search has been mooted. The fact that respondent may have left New York jurisdiction confers on him no immunity from prosecution on the illegal weapons charge. Also, the absence of any State appellate authority on this subject argues that we consider it here. Finally, the manifest public importance of this issue, and the need for its clarification, further persuade us that this appeal would in any event be an exception to the mootness doctrine. (*See, e.g., Matter of Weissman v City of New York*, 96 AD2d 454 [1st Dept], *appeal dismissed* 60 NY2d 815 [1983]; *People ex rel. Guggenheim v Mucci*, 32 NY2d 307 [1973].)

We should note, also, that we need not and do not consider whether the court below erred in holding that respondent's detention under the Interstate Compact on Juveniles and the State truancy laws are unlawful. The facts present us with yet another example of the continuing yet necessary tension between the uniquely constructive, protective and rehabilitative aims of the juvenile justice system and the manifest necessity of

according children the "fundamental fairness" which the Supreme Court decision in *In re Gault* (387 US 1 [1967]) and its progeny demand in a juvenile's encounters with the authority of the State. That this tension continues unabated is shown by the recent decision of the Supreme Court of the United States in *Schall v Martin* (467 US __, 104 S Ct 2403 [1984]) which affirmed the constitutionality of a provision of the Family Court Act of this State which allowed the pretrial detention of certain accused juvenile delinquents on a finding that there was a "serious risk" that such juveniles "may before the return date commit an act which, if committed by an adult, would constitute a crime." While emphasizing that the pretrial detention statute contained certain necessary procedural safeguards, the court in *Schall* acknowledged as legitimate State interests not only the protection of those citizens who might be victims of a juvenile's criminal acts but the necessity of protecting the juvenile himself from the consequences of his own actions.

As the *Schall* court stated (p __, p 2410): "Children, by definition, are not assumed to have the capacity to take care of themselves. They are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as *parens patriae*." (*See also, New Jersey v T.L.O.*, 469 US __, 105 S Ct 733 [Jan. 15, 1985].)

That children cannot be considered, in law, fully independent and autonomous beings flows necessarily not only from the fact of their physical immaturity but also because, by the sheer, immutable fact of youth, they are lacking both in intellectual development and in the formation of moral character. Children, thus, need the guidance of adults. They need instruction. They need protection. And no child is more immediately or desperately in need of protection than the child runaway.

We cannot close our eyes to the fact that New York City, and the Times Square area in particular, has become the national center for runaway children from all parts of this country. Neither can we pretend ignorance of the fact that the plight of these runaways is tragic, and that there exist predatory individuals who have made a diabolical yet profitable cottage industry out of the commercialized degradation and abuse of these frightened, penniless, disoriented youngsters. It is not empty melodrama to state that too many runaway children will meet with serious injury, even death, through systematic physical abuse or through chemical dependency and its attendant horrors. And those children who see crime as their only means of survival face, of course, the sordid half-life of the career criminal.

■ We note, then, that Family Court Act § 718, the "runaway statute" under which respondent Terrence G. was detained, is clearly a legitimate and indeed unassailable exercise of the *parens patriae* authority, since it serves to rescue children from the clear possibility of imminent and extreme physical, moral and psychological harm.

We find that the police officers who detained respondent under section 718 had probable cause to do so. Respondent's presence in an area known to be a national gathering place for runaways, his admission that he was only 15 years old and that he had come to New York from a distant State, and his inability or refusal to provide the police with a local address not only satisfy the criteria of section .718 as to what constitutes a "reasonable opinion" that a child is a runaway, but indeed make any other conclusion as to the boy's status highly speculative, to say the least. In theory, the only way for the detaining officers to ascertain whether this respondent had indeed run away from home would have been to contact the boy's parents in South Carolina. Even then, respondent would have had to have been detained until that contact was effected.

Moreover, in order to ensure that they had probable cause to detain respondent, it was not incumbent on the detaining officers to conclusively eliminate any other possible reason for the boy's presence in Port Authority at that time. Indeed, the need for such an investigation is the very rationale for the child's detention under the statute. Respondent's youthful appearance, his whereabouts and the information he provided fully satisfied the statutory criteria for his detention.

Having found that the transit officers had probable cause to detain respondent, we find further that respondent's detention in a specified area of Port Authority and his subsequent removal to a school facility where his status could be definitely ascertained and arrangements made for his return home were also lawful, being necessary to effectuate the purpose of the statute.

There remains the central question of the legality of the patdown search undertaken by the detaining officers upon respondent immediately upon his arrival in the detention area.

It is settled that a full search of the person incident to a lawful custodial arrest is a long-acknowledged exception to the warrant requirement. (*See, e.g., United States v Robinson,* 414 US 218 [1973]; *People v Troiano,* 35 NY2d 476 [1974].) This exception is grounded, in part, in the need to protect the public, the arresting officers and the arrestee himself from the possibility of violence in the course of an attempt by the arrestee to resist arrest or

escape police custody. A further rationale for the allowance of a full search on arrest is to allow the seizure of evidence on the arrestee's person, to prevent its concealment or destruction. The United States Supreme Court has held that the police may conduct a full search regardless of the cause of the custodial arrest. Thus, full searches have been upheld on custodial arrests made for relatively minor offenses such as the misdemeanor charge of driving without a license (*United States v Robinson,* 414 US 218 [1973], *supra; Gustafson v Florida,* 414 US 260 [1973]). In these cases, the court declined to qualify the full search exception on the basis of "a rather speculative judgment" that persons arrested for these minor, nonviolent offenses are less likely than others to possess dangerous weapons or because the arresting officer does not have specific reasons to suspect that the arrestee is armed (*United States v Robinson, supra,* at p 234.) Rather, the court emphasized that it is the fact of the lawful arrest which establishes the authority to search: "It is scarcely open to doubt that the danger to an officer is far greater in the case of the extended exposure which follows the taking of a suspect into custody and transporting him to the police station than in the case of the relatively fleeting contact resulting from the typical *Terry* type stop. This is an adequate basis for treating all custodial arrests alike for purposes of search justification." (*United States v Robinson, supra,* 414 US, at pp 234-235.)

The Court of Appeals of this State, however, has not given its blanket approval to all full searches based on lawful custodial arrests but has interpreted the State Constitution to "require that the reasonableness of each search or seizure be determined on the basis of the facts and circumstances of the particular case". (*People v Smith,* 59 NY2d 454, 457 [1983]; *see also, People v De Bour,* 40 NY2d 210 [1976].) Nonetheless, the court has found full searches justified incident to a lawful custodial arrest for such relatively minor, nonviolent violations as driving while one's license was suspended or revoked, a misdemeanor (*People v Troiano,* 35 NY2d 476 [1974]) or criminal trespass, a violation or misdemeanor (*People v Weintraub,* 35 NY2d 351 [1974]). The Court of Appeals found these searches justified by the need, in the individual case, to protect the safety of the arresting officers and fellow prisoners and because the arrest itself constituted the greatest intrusion upon the arrestee's rights. These cases, then, refuse, as does the United States Supreme Court, to draw an artificial distinction, as to the legality of full searches, based on a speculative and unsupported correlation between the type and degree of crime charged and the arrestee's theoretical propensity toward postarrest violence.

Respondent argues, however, that because he was detained under a noncriminal statute, the rationale underlying the above-cited cases has no application to him. He further argues that, while a criminal arrest for any violation, great or small, constitutes a "gross intrusion" on individual privacy because it represents the first step in a series of "intrusions" incident to the individual's exposure to the investigative and adjudicative authority of the law, his noncriminal detention entailed no such justification for the intrusion of the patdown search.

We are mindful that respondent was stopped and detained, not on suspicion of criminal activity, but under the noncriminal runaway statute, a statute enacted for the protection, not the prosecution of children. And we are aware that the State's most benign intentions, if coupled with unfettered discretion, may sometimes result in the abuse of individual rights and dignity. While we make no general judgments whatsoever on the rights of individuals detained under other noncriminal statutes, we do find that respondent's proposed dichotomy between full searches made on criminal arrests and his claimed immunity from search under section 718 detention, to be without a rational basis.

We must remember that the search complained of here was not a full custodial search, as were those searches discussed in the cases cited *infra*. It was a patdown search, the patting down of respondent's outside clothing designed to uncover the outline of a weapon hidden inside the clothing. While still an intrusion on privacy, the patdown is the least intrusive method by which an arresting officer may discover and confiscate a dangerous weapon.

While under noncriminal detention, respondent was clearly "in custody"; he was not free to come and go as he wished. He had been brought to the detention area, where other children similarly detained already waited. He was later to be transported to a school facility where arrangements would be made for his return home. This extended period of custody clearly presents the risks to police and others acknowledged in *United States v Robinson (supra)*, *Gustafson v Florida (supra)*, and *People v Troiano (supra)*.

■ Nothing in the noncriminal appellation of this detention serves to obliterate the dangers of the "in-custody" situation. Here, the circumstances of respondent's detention, coupled with the particularly high duty of protection owed him and other detainees by the runaway statute, were more than ample justification for the patdown.

In this context, we hold that the lower court erred in refusing to consider testimony regarding the nature and special problems of the Port Authority/Times Square area in which the police officers found respondent. Evidence of the "high crime" or dangerous character of a particular area is admissible as one factor in considering the reasonableness of police searches in that area. (*People v Oden,* 36 NY2d 382 [1975]; *People v De Bour,* 40 NY2d 210 [1976]; *People v Holman,* 90 AD2d 746 [1st Dept 1982].) It is general knowledge, and certainly within the experience of police officers who patrol the Times Square area, that it is a high-crime area, that many of those crimes are committed by juveniles who are either truants or runaways, and that many of those juveniles are armed.

This circumstance must be seen in tandem with the sole purpose of the runaway laws: the protection of runaway children from harm. The police officers who detained respondent and other runaways in the detention area were clearly charged with effectuating the State's *"parens patriae* interest in preserving and promoting the welfare of the child". (*Santosky v Kramer,* 455 US 745, 766 [1982].) They were undoubtedly aware of "the desirability of protecting the juvenile from his own folly" (*People ex rel. Wayburn v Schupf,* 39 NY2d 682, 689). It was their responsibility, *inter alia,* to protect the child from any physical harm that might come to him as a result of his criminal activity. (*Schall v Martin,* 467 US ___, 104 S Ct 2403, *supra.*)

This case, then, presents the following considerations: Respondent, a juvenile and probable runaway, was detained by police in an area notorious for its high incidence of criminal activity by armed juvenile runaways. As a runaway, respondent was almost certainly frightened, disoriented and resentful or distrustful of adult authority. Respondent was detained under the authority of a statute whose sole purpose is his protection and welfare. He was placed under full custodial arrest. He was brought into a detention area where he would necessarily have extensive contact with other children similarly detained and to whom the authorities owed a similarly high standard of protection. To ensure the safety of respondent, other detained runaways and themselves, the police then conducted a patdown search of respondent.

Given the location and nature of respondent's first encounter with the detaining officers, the fact that he was lawfully in full custody under the authority of a statute that exists solely for his protection and the protection of other children in the detention area, and given the limited nature of the search, we find the

legality of that search to be irrefutable. Any other result would undermine the vital purpose of the runaway laws and, in effect, demand of our police officers that they abdicate common sense.

■ Finally, we must disagree with the lower court's view that the section 718 standards for detaining a juvenile are so broad and subjective as to be "virtually unreviewable" by a court, and thus openly invite a plethora of "sham" or "pretext" arrests. There is nothing in the facts of the instant case to suggest that respondent was the victim of a "pretext" arrest, nor is the statute in question "unreviewable". Section 718, instead, sets out specific criteria to be used by a police officer in determining a "reasonable opinion" that a given juvenile is a runaway. While the statute allows a certain limited element of discretion in the officer's determination, that element is circumscribed and far from the sort of untrammelled individualism that would in fact render the provision unreviewable.

The order of the Family Court, New York County (Sara P. Schechter, J.), entered on March 28, 1984, should be reversed, on the law and the facts, without costs, respondent's motion to suppress denied, and the juvenile delinquency petition reinstated, and the matter remanded to the Family Court for further proceedings.

Ross, Bloom, Milonas and Kassal, JJ., concur.

Order, Family Court of the State of New York, New York County, entered on April 10, 1984, unanimously reversed, on the law and the facts, without costs and without disbursements, respondent's motion to suppress is denied, and the juvenile delinquency petition is reinstated, and the matter remanded to the Family Court for further proceedings.