In the Matter of GISSETTE ANGELA P., a Person Alleged to be a Juvenile Delinquent, Appellant.

First Department, December 5, 1991

118

**APPEARANCES OF COUNSEL**

*Kenneth Rabb* of counsel *(Carol Goldstein* and *Elizabeth Brown* with him on the brief; *Lenore Gittis,* attorney), for appellant.

*Ellen B. Fishman* of counsel *(Elaine Windholz* with her on the brief; *Victor A. Kovner, Corporation Counsel,* attorney), for presentment agency.

### OPINION OF THE COURT

Per Curiam.

On January 23, 1990, a Tuesday, at 5:00 P.M., appellant was observed through a one-way mirror by Detective Harvey Garry of the Port Authority Police for a period of about 10 minutes as she waited on line for a bus bound for Virginia. The detective testified that his attention was drawn by her youthful appearance and the fact that she was unaccompanied. He noticed that she was shifting nervously from one foot to another, looking around constantly, back and forth and over her shoulder, and glancing at her midsection, where there was a grapefruit-sized bulge under her coat.

The detective followed appellant onto the bus and sat down behind her in the sixth-row aisle seat. His partner, Detective Lasak, also boarded the bus, taking a seat directly behind the driver. Detective Garry leaned forward and asked appellant if she would speak with him. She replied that she "didn't mind". Garry stated, "My priorities at that point, I would say, would be possibly that she could have been a juvenile runaway; that she had a problem; something was wrong." He asked her if she was traveling alone and how old she was. Appellant confirmed that she was alone and asserted that she was 18. Garry noted that she appeared to be only 13 or 14, and the Family Court observed that "she does not in any way resem-

ble an 18-year-old". (Appellant was, in fact, 14.) Garry then elicited that she was traveling to Norfolk, Virginia. When he asked if she had family there, appellant did not respond directly, but stated that he could search her bag. When Garry told her it was the bulge at her waist he was interested in and not the bag, she unzipped her coat and handed him a plastic bag containing what later proved to be cocaine. Family Court found that Garry was a credible witness, that his conduct in engaging appellant in conversation constituted a minimal intrusion which was heightened by her evasive answers to his questions, and that no search or custodial interrogation was conducted. Accordingly, her motion to suppress the evidenced was denied.

In *People v De Bour* (40 NY2d 210, 218), the facts of which closely resemble the facts of the case at bar, it was stated that "in the performance of their public service functions, not related to criminal law enforcement, the police should be given wide latitude to approach individuals and request information." Section 718 of the Family Court Act, governing the return of runaway children, "requires some inquiry by a police officer prior to detaining a juvenile" *(Matter of Doris A.,* 145 Misc 2d 222, 225, *affd* 163 AD2d 63, *lv denied* 76 NY2d 712). Detective Garry's inquiry was appropriate in view of the purpose sought to be achieved by the statute and entirely justifiable. "The minimal intrusion of approaching to request information is permissible when there is some objective credible reason for that interference not necessarily indicative of criminality" *(People v De Bour,* 40 NY2d 210, 223, supra). The detective, based on his knowledge that the bus station attracts passengers carrying illegal drugs, and on his observation of the girl's nervous behavior and the bulge in her midsection, had an "objective credible reason" to make an informational inquiry. There was no detention of appellant and not "even a hint of harassment or intimidation" *(People v Hollman,* 168 AD2d 259, 261). Her decision to hand over the bag containing the contraband was not the result of coercion *(People v Gonzalez,* 39 NY2d 122, 128).

The contention that the encounter, culminating in the surrender of contraband, was tantamount to a seizure because it took place within the close confines of a bus was rejected in *Florida v Bostick* (501 US —, 111 S Ct 2382 [1991]). The concerns raised by the dissent are essentially those raised by the dissenters in *Bostick* and do not warrant further discussion. Moreover, the instant matter is factually distinguishable

in two important respects. Unlike *Bostick,* in which the police concededly approached the defendant "without articulable suspicion" (501 US —, —, *supra,* 111 S Ct 2382, 2384-2385, *supra),* Detective Garry had the statutory authority and even the duty to approach and question an unaccompanied child in a location known to be frequented by truants and runaways and to have a high incidence of drug activity (Family Ct Act § 718 [a]; *People v De Bour, supra,* at 220; *Matter of Terrence G.,* 109 AD2d 440, 447).

It is our understanding that the dissent advocates a per se rule, similar to the one rejected in *Bostick (supra),* that the questioning of a minor on a bus constitutes a seizure within the meaning of the Fourth Amendment. Significantly, the dissent relies on *People v Gonzalez (supra),* which established the rule that, with narrow exceptions, "a warrantless search of an individual's *home* is per se unreasonable and hence unconstitutional" *(People v Knapp,* 52 NY2d 689, 694 [emphasis added]). The dissent incorrectly concludes that it is the People who face a heavy burden to establish consent to a search rather than the appellant who, upon a motion to suppress evidence, bears the burden of persuasion *(People v Di Stefano,* 38 NY2d 640, 652; *People v Rockwell,* 137 AD2d 874, 875; *see, People v Love,* 57 NY2d 998). While this matter is clearly governed by *People v De Bour (supra),* which the dissent does not attempt to distinguish, even if it were conceded, arguendo, that appellant was detained, her detention would be authorized under the circumstances of this case by section 718 of the Family Court Act. Moreover, as the dissenter has previously observed, there is no theoretical distinction to be drawn between criminal and noncriminal detention since "it is the fact of the lawful arrest which establishes the authority to search" *(Matter of Terrence G., supra,* at 445). Therefore, even assuming that appellant had been seized by Detective Garry, a full search of her person was justified as incident to a lawful custodial arrest *(supra).*

Furthermore, unlike *Bostick (supra),* there is no dispute that appellant voluntarily opened her coat and surrendered the contraband to Detective Garry, and Family Court so found. In this respect, the encounter is remarkably similar to the one in *People v De Bour (supra),* in which the defendant was approached by two patrolmen in a drug-prone location and a bulge noted at his waist. Seizure of a .38 caliber Smith and Wesson revolver, observed when De Bour unzipped his jacket in response to the officers' request, was held justified. As in

the matter before us, "the crime sought to be prevented involved narcotics and the Legislature has declared that to be a serious crime" (40 NY2d 210, 220, *supra*). Unlike the matter before us, the patrolmen in that case could not invoke any statutory authority to authorize detention of the suspect.

The dissent, judging Family Court's "view of what transpired to be utterly fantastic", takes exception to the factual findings made at the *Mapp* hearing. As we have previously noted, " 'where different inferences may be drawn from the proof, the choice of inferences rests with the trier of fact and should not be rejected by an appellate court unless unsupported as a matter of law' " *(Matter of Robert S.,* 159 AD2d 358, 359, *appeal dismissed* 76 NY2d 770, quoting *People v Hartley,* 103 AD2d 935, *affd* 65 NY2d 703). What's more, the circumstances surrounding the child's imminent departure, late on a Tuesday afternoon, on a bus bound for Virginia, admit of only two possible inferences. First, the child might spend some time in Virginia—in which case she would not be back in New York in time to attend class at the beginning of the school day on the following morning—raising a question of truancy. Second, she might make the return trip from Norfolk to New York City in the dead of night, to arrive in time for the start of classes—in which case the officer's concern about the purpose of her journey would hardly be allayed. We cannot understand the dissent's suggestion that a police officer may approach a minor to protect the child from the consequences of truancy but may not so inquire if, in addition, circumstances suggest that the child may be employed in the interstate transportation of dangerous narcotics as a courier or "mule". This suggestion takes an artificially narrow view of the role of State authorities to act in loco parentis for the protection of the welfare of minors.

Family Court's characterization of appellant's questioning by Detective Garry as noncustodial was entirely correct. However, under the circumstances presented by this case, custodial detention and a search conducted incident thereto would have been justified pursuant to the provisions of section 718 of the Family Court Act in furtherance of its stated purpose of returning runaway children to their parents or others responsible for their care.

Accordingly, the final order of the Family Court, New York County (Judith Sheindlin, J.), entered June 25, 1990, which adjudicated appellant a juvenile delinquent and placed her with the New York State Division for Youth, Title III, for a

period of 18 months after finding that she committed acts which, if committed by an adult, would constitute the crime of criminal possession of a controlled substance in the first degree, should be affirmed, without costs.

MURPHY, P. J. (dissenting). The appellant, Gissette Angela P., has been adjudicated a juvenile delinquent and placed with the New York Division for Youth for 18 months following a determination that she committed acts, which, if committed by an adult, would constitute criminal possession of a controlled substance in the first degree. Four and three-quarters ounces and 32 grams of cocaine were found in a pouch which the appellant wore around her waist.

The circumstances under which the appellant's possession of the cocaine came to light were the subject of a *Mapp* hearing held to determine whether there had been a violation of the appellant's Fourth Amendment rights warranting suppression of the cocaine. At the hearing Detective Garry testified that, at the time of the events in question, he was assigned to the drug interdiction program at the Port Authority Bus Terminal. On January 23, 1990 he noticed the appellant waiting in line to board a bus. She was, according to Garry, "very nervous" and was "shifting from foot to foot"; she would look back and fourth and glance down at her midriff. Around the appellant's waist and covered by her coat, Garry noticed a "grapefruit-sized" bulge.

After about 10 minutes, the appellant along with the other passengers handed her ticket to the bus driver and boarded the bus. It was at this point, when the appellant had settled in her seat and was awaiting the bus's imminent departure, that Garry and his partner Detective Lasak entered the bus. Lasak remained at the front of the bus, while Garry proceeded to a seat directly behind the appellant. Garry, who was over six feet tall, then leaned forward over the appellant who appeared to him to be no more than 13 or 14 years old. He brandished his badge and proceeded to question the appellant concerning her age and her destination. The pretextual nature of these questions must have been obvious, for the appellant responded by offering to permit Garry to search her bag. It was at this juncture that Garry disclosed his true interest. He stated, "I'm not interested in your bag. What I'm interested in is this bulge in your coat." The appellant then removed two large earrings from her coat pocket, but Garry's "interest" remained unsatisfied. He persisted, saying, "I'm still inter-

ested in that bulge. The bulge is still there. What is in the coat?" Appellant then unzipped her coat and removed a plastic bag subsequently found to contain cocaine.

As I understand it, it is the majority's position that the Fourth Amendment's injunction against unreasonable searches and seizures has no application to the above-described sequence of events. The majority appears to believe that the appellant was neither seized nor searched within the meaning of the Fourth Amendment. Rather, as the majority would have it, the appellant was merely approached for information and was thereafter moved of her own free will to open her coat and surrender to the police the package of contraband she had secreted around her waist and which now constitutes the basis for her conviction. Respectfully, I find this view of what transpired to be utterly fantastic. I should think it plain that the appellant did not simply agree to turn over the contraband she carried as a result of an informational chat with Detective Garry. The reality is that the appellant was coerced into disgorging the incriminating evidence by means of a police procedure which must surely implicate Fourth Amendment concerns as it entailed both a seizure and a search of the appellant's person.

While petitioner and the majority urge that the appellant was initially approached out of the narcotics detectives' otherwise disinterested concern for the welfare of an apparently nervous teen-ager traveling alone, this was obviously not the case. The sight of a teen-ager waiting to board a bus, understandably nervous at the prospect of a long trip alone, cannot be unusual in a large bus terminal and it cannot be seriously contended that so unremarkable a sight would ordinarily prompt inquiry by two narcotics detectives. Moreover, it would never have prompted the extreme form of inquiry to which the appellant was from the outset subjected. The detectives did not simply approach the appellant as she waited to board the bus and inquire routinely as to her identity, age, and destination. Rather, they waited until the appellant had surrendered her ticket and taken her seat on the bus. It was then, as the bus was about to depart, that the narcotics detectives chose to accost the appellant. As noted, the detectives boarded the bus together, one of them, Detective Lasak, remaining at the front of the bus where he would be able to block the appellant's exit, while the other, Detective Garry, approached the appellant from behind. After making a show of his authority and asking two or three obviously pretextual

questions, Garry pursued with great persistence the interest which had caused him to board the bus in the first place, namely, the bulge under the appellant's coat. It was not long before he simply demanded to know "What is in the coat?"

As a practical matter the teen-age appellant was trapped. She could not leave the bus without missing its departure or forfeiting her ticket and, in any event, there was every indication that she would not have been permitted to leave even if she had attempted to do so. Manifestly, she must have felt, as would have almost anyone in her position, that she had no alternative but to submit then and there to the authority of the badge and to disclose, in accordance with Detective Garry's demand, what she had under her coat.

The essential question in determining if there has been a seizure within the meaning of the Fourth Amendment, is whether "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business' " *(Florida v Bostick,* 501 US —, —, 111 S Ct 2382, 2387, quoting *Michigan v Chesternut,* 486 US 567, 569). Can it be then, as the majority would apparently hold, that when a police officer confronts a youth within the narrow confines of a bus under circumstances in which the youth's egress is a practical if not physical impossibility, and hovers over the youth while displaying his badge, repeatedly asking and eventually demanding to see what the youth has under her coat, that the youth would nevertheless feel free to ignore the police presence and go about her business? I would have thought that the self-evident answer to this inquiry, which is precisely the inquiry here presented, would be a resounding no. In holding to the contrary, however, and characterizing this as an entirely consensual encounter devoid of " 'even a hint of harassment or intimidation' " (quoting *People v Hollman,* 168 AD2d 259, 261), the majority reduces the protective scope of the Fourth Amendment *to* a degree virtually unprecedented. Indeed, apart from certain decisions of this court yet to be reviewed by the Court of Appeals *(see, People v Hollman, supra, lv granted* 77 NY2d 961; *People v Saunders,* 173 AD2d 239, *lv granted* 78 NY2d 958) and apparently in conflict with other decisions by this same court also still to be reviewed *(see, e.g., People v Irizarry,* 168 AD2d 377, *lv granted* 77 NY2d 912; *Matter of Antoine W.,* 162 AD2d 121, *lv granted* 171 AD2d 1086), I know of no authority which would insulate the sort of

police intrusion here at issue from Fourth Amendment scrutiny.

It is, of course, true, as the majority notes, that the United States Supreme Court has held in *Bostick (supra)* that the fact that the police initiate an encounter with a passenger upon a bus is not itself sufficient to support the conclusion that the passenger has been seized. But it is a long way from this relatively limited holding to that which the majority announces today. For in leaving open the possibility that Bostick might not have been seized within the meaning of the Fourth Amendment, the Supreme Court dealt with an adult defendant who had been "specifically advised * * * that he could refuse consent" to the search of his bag *(Florida v Bostick,* 501 US, *supra,* at —, 111 S Ct, *supra,* at 2388). Here, by contrast, the detectives descended upon a "very nervous" teen-ager obviously susceptible to police pressure who was not advised of her right to withhold consent and who would not have had even a clue that she could do so in the patently coercive situation in which she found herself. Moreover, while the location in which an encounter takes place may not be dispositive in determining whether there has been a seizure, there is nothing in *Bostick* which would suggest, as does the majority, that it is not an important factor to be considered. Far from constituting a license to disregard the location in which the police choose to initiate an encounter, *Bostick* stands for the considerably more modest proposition that "[w]here the encounter takes place is one factor, but it is not the only one" (501 US, *supra,* at —, 111 S Ct, *supra,* at 2387). Where, as here, the police contrive to encounter an individual within a closely confined and apparently blockaded space and thereby to profit from the naturally arising perception that their presence and authority is unavoidable, the characterization of the encounter as consensual, it would seem, must rest upon the existence of other circumstances tending to mitigate the presumably intentionally conveyed initial impression of a domineering police presence. But, certainly, nothing in the subsequent conduct of Detectives Garry and Lasak would have diminished the impression which they obviously sought to encourage when they chose to accost the appellant upon the bus, namely, that their inquiry was not one which could be avoided.

While characterizing the encounter as entirely consensual, the majority, nevertheless, advances the view that the arrest and search of the appellant would have been permissible

under section 718 (a) of the Family Court Act. Conspicuously absent from the majority memorandum, however, is the basis for this conclusion. The majority, of course, must recognize that section 718 (a) of the Family Court Act is not a license for the indiscriminate detention of juveniles. Rather, the statute authorizes detention only for the limited purpose of facilitating the return of those juveniles reasonably suspected of being runaways to their parents or other lawful guardians. The majority asserts that "Detective Garry had the statutory authority and even the duty to approach and question an unaccompanied child in a location known to be frequented by truants and runaways and to have a high incidence of drug activity". It will doubtless come as a surprise to the police to learn that they have a "duty" to approach and question every unaccompanied juvenile in the Port Authority Bus Terminal and other like facilities. But assuming that such a duty is created by the statute, a supposition which I believe to be manifestly without basis, the issue presented is not whether there was some basis to approach the appellant, but whether there was a basis to detain her. More specifically, the relevant inquiry is what particular circumstances would have reasonably justified Detective Garry in concluding that the appellant had run away from home. The majority does not even begin to address this essential question. Indeed, in the absence of any explanation as to how the majority has reached the conclusion that the detention of the appellant as a runaway would have been permissible, I can only gather that it is the majority's view that any unaccompanied young traveler in the Port Authority Bus Terminal may be supposed a runaway and detained as such. It must be thought curious that the majority would on the one hand go out of its way to emphasize that section 718 of the Family Court Act " 'requires some inquiry by a police officer prior to detaining a juvenile' " (quoting *Matter of Doris A.*, 145 Misc 2d 222, 225, *affd* 163 AD2d 63, *lv denied* 76 NY2d 712), and on the other hand reduce the predicate for lawful seizure under that same statute to the point that inquiry becomes wholly dispensable.

The majority's apparent inability to articulate any factual predicate for the conclusion that the appellant was a runaway is hardly surprising—there was none. Although the majority may believe otherwise, I should have thought it clear that a teen-ager, even a somewhat nervous teen-ager, could wait for and board a bus for which she had purchased a ticket without being supposed a runaway and seized as such. It is all well

and good for the majority to cite this court's opinion in *Matter of Terrence G.* (109 AD2d 440, 445) for the unexceptionable proposition that a lawful arrest establishes the authority for a search of the arrestee, but this only begs the question whether the arrest was or, to adopt the majority's perspective, would have been, lawful, a question with which the majority does not deal except in the most conclusory and inadequate way. Indeed, the relevance of *Terrence G.* to the matter at bar lies not in its discussion of what constitutes a lawful predicate for a search but in its consideration of what constitutes a lawful predicate for an arrest under section 718 of the Family Court Act. In this connection, the facts of *Terrence G.* which the majority does not trouble to review are critical. The respondent in *Terrence G.,* a 15 year old, was encountered by members of the Transit Police truancy squad on a subway platform at the subway station adjoining the Port Authority Bus Terminal. The encounter took place at 12:30 on the afternoon of a school day. When asked why he was not in school, the respondent replied that he had just arrived in New York City by bus from South Carolina. In response to further inquiry, the respondent indicated that he had nowhere to stay in New York *(Matter of Terrence G., supra,* at 441-442). Under these circumstances, in which the school-age respondent was apparently at loose ends in the middle of a school day, and in which inquiry revealed that he had recently arrived in New York City from a distant place and had nowhere to stay, it was entirely reasonable for the truancy squad officers to have approached the respondent and, after inquiry, to have detained him as a suspected runaway. The situation at bar is entirely different. Here, the appellant was encountered at 5:00 P.M. and could not have been suspected of truancy, nor was she loitering aimlessly in the station. She was engaged in the entirely appropriate activity of waiting for a bus in a bus terminal in the early evening, a reasonable time for an adolescent to be traveling on her own. The police had absolutely no reason to suspect that the appellant had run away from home or was at loose ends and in need of their assistance to shield her from the corrupting influences of the Port Authority Bus Terminal and its environs which she was, in any event, about to leave.

As noted, the reality is that far from seeking to protect the appellant and return her to her home, the narcotics detectives followed her onto the bus because they suspected her of crime. There was, however, no more basis to detain and search her

on suspicion of criminal conduct than there would have been to do so on the untenable supposition that she was a runaway. The majority finds the present case factually distinguishable from *Bostick (supra)* because in *Bostick* the police approached the defendant "without articulable suspicion". (501 US, *supra*, at —, —, 111 S Ct, *supra*, at 2384-2385.) But the distinction the majority would draw possesses neither relevance nor substance. The issue in *Bostick* was not whether the police had grounds to approach the defendant, or even to detain him. To the contrary, both of these issues were treated by the court in *Bostick* as settled; the *Bostick* court's analysis proceeded from the premise that Bostick was approachable but that, in the absence of any articulable indicia of criminal involvement, he was not detainable. The single issue presented then, was whether Bostick had in fact been seized, for if he had it was clear that the seizure, concededly lacking the required predicate, would have been unlawful. Here, too, the issue is not, as the majority repeatedly suggests, whether the appellant might have been approached, or, really, whether she could have been seized, for apart from the unsupported and I believe unsupportable assertion that a seizure of the appellant would have been permissible under section 718 of the Family Court Act, the majority makes no argument that there were grounds for a seizure; and, indeed, it is plain that at the time the detectives first accosted the appellant they had absolutely no objective ground to suppose that she was committing any crime. They had at best a hunch, the basis of which has yet to be articulated, that the "grapefruit-sized" bulge around the appellant's waist contained contraband. But "[v]ague or unparticularized hunches will not suffice" to render a detentive stop lawful *(People v Cantor,* 36 NY2d 106, 113), for it is by now well established that "[t]he minimum requirement for a lawful detentive stop is a founded suspicion that criminal activity is afoot" *(People v Cantor, supra,* at 114). Here, as in *Bostick,* then, it is, or ought to be, clear that if a seizure occurred, it was unlawful. Accordingly, the single relevant question in both cases is whether a seizure did in fact occur.

In concluding that the appellant was seized, I have not, contrary to the majority's purported understanding, relied solely upon the circumstance that the appellant, a minor, was accosted and questioned aboard a bus. It is also relevant that the appellant was made the object of a well-orchestrated and persistent effort at inducing disclosure and that she did not know and was not advised that she was under no obligation to

respond to the officers' inquiry or to comply with their demand that she open her coat. Having said this, the fact that the police chose to initiate this encounter in a setting in which the real alternatives to submitting to the authority of the badge would have seemed practically nonexistent, even to an adult, cannot be minimized.

Although I am of the view that the contraband must be suppressed as the fruit of an illegal seizure, I would note that even if, as the majority contends, no seizure occurred, suppression of the contraband would still be required since, regardless of how the initial encounter is characterized, the appellant's subsequent consent to what amounted to an otherwise unwarranted search of her person cannot be said to have been voluntarily given. The majority states that "there is no dispute that appellant voluntarily opened her coat and surrendered the contraband" but that is plainly inaccurate. Nor is it the case, as the majority implies, that the motion court's findings on the issue of voluntariness are somehow immune from appellate review. It is the prosecution's burden to establish that the consent for a search has been voluntary, and the burden is a heavy one *(People v Gonzalez,* 39 NY2d 122, 128). Clearly, it is entirely appropriate for an appellate court, when called upon, to review the record to determine whether, as a matter of law, the prosecution has met its considerable burden. *(See, e.g., supra.)* In performing this evaluation, it is well to bear in mind that "[c]onsent to search is voluntary when it is a true act of the will, an unequivocal product of an essentially free and unconstrained choice. Voluntariness is incompatible with official coercion, actual or implicit, overt or subtle" *(supra,* at 128). The notion so readily embraced by the majority that the appellant's eventual, and obviously reluctant, decision to open her coat was the product of an essentially free and unconstrained choice can hardly reflect a realistic assessment of the situation. It is in the end only by taking the greatest liberty with language that the majority can conclude that a teen-ager, cornered by narcotics detectives upon a bus and asked repeatedly and insistently pursuant to the authority of the badge to disclose what was underneath her coat, had, in acceding to this demand, freely consented to be searched. The extravagance of the claim is only heightened by the circumstance that, unlike Bostick, the present appellant was never advised that she could decline to cooperate with the detectives. Indeed, I must confess that I find the majority's implicit assertion that the procedure employed by

the police was not even subtly coercive *(see, People v Gonzalez, supra)* to be altogether baffling.

I can only observe that if so gratuitous and frankly absurd a characterization of what occurred is to become the basis for law, there is not one of us who cannot be arbitrarily accosted upon a bus, plane or train and asked repeatedly pursuant to the authority of the badge to divulge what we have packed in our bags or concealed beneath our clothing. Doubtless the majority's novel and expansive notion of what the police may do under the rubric of "inquiry", free of Fourth Amendment constraint, will facilitate the apprehension of some drug couriers who might otherwise go free. But in permitting the investigative net to be so widely cast without articulable basis the majority also inevitably facilitates untold intrusions upon the innocent. For every case in which a police officer's hunch proves accurate, there will certainly be numerous others in which the pursuit of a hunch in the manner here permitted will result only in the intimidation and search of an innocent person. What the court sanctions today is not clever police work but harassment. Courts have long recognized that the right to be left alone is "too precious to entrust to the discretion of those whose job is the detection of crime" *(McDonald v United States,* 335 US 451, 455), yet in unaccountably characterizing the intrusion here at issue as being of subconstitutional significance the majority has done no less than afford the police a measure of discretion fundamentally incompatible with that precious right. I, therefore, find it necessary to dissent.

Accordingly, the final order of the Family Court, New York County (Judith Sheindlin, J.), entered June 25, 1990, which adjudicated appellant a juvenile delinquent and placed her with the New York State Division for Youth, Title III, for a period of 18 months after finding that she committed acts which, if committed by an adult, would constitute the crime of criminal possession of a controlled substance in the first degree, should be reversed, the motion to suppress evidence granted and the petition dismissed.

SULLIVAN, ELLERIN, ROSS and RUBIN, JJ., concur; MURPHY, P. J., dissents in a separate opinion.

Final order, Family Court, New York County, entered June 25, 1990, affirmed, without costs.